MICHAEL J. GABLEMAN, J.
f 1. This is a review of a published decision of the court of appeals[1] affirming the Dane County circuit court's[2] grant of summary judgment in favor of Peggy Z. Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie K. Stangel, Jane Weidner and Kristin A. Voss ("Coyne"). Coyne sought a declaratory judgment that 2011 Wisconsin Act 21 ("Act 21") is unconstitutional as applied to the Superintendent of Public Instruction ("SPI") and the Department of Public Instruction ("DPI"). Among other things, Act 21 amended portions of Wis. Stat. ch. 227, which governs the procedures for administrative rule-making and now allows the Governor (and in some instances the Secretary of Administration) to permanently halt the rulemaking process. The circuit court *453 concluded that Act 21 is unconstitutional as applied to the SPI because it gives superior authority over public instruction to officers who are not subordinate to the SPI. As a result, it permanently enjoined Governor Scott Walker and Secretary of Administration Michael Huebsch[3] from proceeding thereunder with respect to the SPI.
| 2. The court of appeals affirmed, largely adopting the reasoning of the circuit court. Coyne v. Walker, 2015 WI App 21, ¶ 36, 361 Wis. 2d 225, 862 N.W.2d 606. The court of appeals relied on our decision in Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), specifically noting that in Thompson we determined that rulemaking is a supervisory power of the SPI. Coyne, 361 Wis. 2d 225, ¶¶ 23-24. Applying Thompson's reasoning, the court of appeals concluded that although the Legislature has the authority to give, not give, or take away the SPI's supervisory powers, " [w]hat the legislature may not do is give the SPI a supervisory power relating to education and then fail to maintain the SPI's supremacy with respect to that power." Id,., ¶ 25.
¶ 3. The issues presented for our consideration are threefold. The first is whether administrative rule-making is a supervisory power of the SPI and DPI. The second is whether Article X, § 1 of the Wisconsin Constitution allows the Legislature to vest the supervision of public instruction in any "other officers" it chooses. The third is whether Act 21 vests the supervision of public instruction in the Governor and the Secretary of *454 Administration by giving them the authority to prevent the SPI and DPI's promulgation of rules.
¶ 4. We hold that Act 21 is unconstitutional and therefore void as applied to the Superintendent of Public Instruction and his subordinates. Article X, § 1 requires the Legislature to vest the supervision of public instruction in officers of supervision of public instruction. The current statutory scheme requires the SPI to promulgate rules in order to supervise public instruction. Because Act 21 does not provide a way for the SPI and DPI to proceed with rulemaking if the Governor or Secretary of Administration withholds approval, Act 21 gives the Governor and the Secretary of Administration the power to "manage, direct, or oversee" the primary means by which the SPI and DPI are required to carry out their supervisory duties. Thus, Act 21 unconstitutionally vests the supervision of public instruction in officers who are not officers of supervision of public instruction in violation of Article X, § 1. Consequently, Act 21 is void as applied to the SPI and his subordinates.
I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
A. 2011 Wisconsin Act 21
¶ 5. On May 23, 2011, Governor Walker signed into law 2011 Wisconsin Act 21. At the heart of this controversy are the provisions of Act 21 that changed portions of Wis. Stat. ch. 227 sub. II (2009-10), the Wisconsin Administrative Procedure Act. This Act prescribes the procedures state agencies must follow in order to promulgate administrative rules. Three sections of Act 21 are especially relevant to the present case: Section 4, Section 21, and Section 32.
*455 ¶ 6. First, Section 4 of Act 21 amended Wis. Stat. § 227.135(2) (2009-10). Wisconsin Stat. § 227.135(2) previously required agencies that had prepared a "scope statement"[4] to submit that scope statement to the Legislative Reference Bureau for publication in the administrative register and to "the individual or body with policy-making powers over the subject matter of a proposed rule" for approval.- Wisconsin Stat. § 227.135(2) now additionally requires an agency that has prepared a scope statement to submit the scope statement to the Governor for approval. The agency may not submit the scope statement to the Legislative Reference Bureau for publication in the Administrative Register nor "perform any activity in connection with the drafting of a proposed rule" unless and until the Governor approves the scope statement in writing. Wis. Stat. § 227.135(2).
f 7. Second, Section 21 of Act 21 amended Wis. Stat. § 227.138(2) (2009-10) and renumbered the subsection to Wis. Stat. § 227.137(6). Wisconsin Stat. § 227.138(2) previously required only those agencies listed in Wis. Stat. § 227.137(1) to receive the Secretary of Administration's approval to submit proposed rules that could result in costs of $20,000,000 or more to the Legislature. Wisconsin Stat. § 227.137(6) now requires all agencies to receive the Secretary of Administration's approval to submit such proposed rules to the Legislature.[5]
*456 f 8. Third, Section 32 of Act 21 created Wis. Stat. § 227.185. Prior to Act 21, agencies would submit final drafts of proposed rules directly to the Legislature for review. See Wis. Stat. §§ 227.135-.19 (2009-10). Wisconsin Stat. § 227.185 now requires agencies to submit any final draft of a proposed rule to the Governor for approval before submitting the draft rule to the Legislature.[6] The Governor then has sole discretion to approve or reject the rule. Wis. Stat. § 227.185. An agency may not submit the proposed rule to the Legislature for review unless the Governor "has approved the proposed rule in writing." Id.
B. The Proceedings Below
¶ 9. The Coyne parties[7] filed an action pursuant to Wis. Stat. § 806.04 seeking declaratory judgment and injunctive relief in the Dane County Circuit Court *457 on October 11, 2011. The complaint named as defendants Governor Walker, Secretary of Administration Huebsch, and Superintendent Anthony Evers, all in their official capacities, and it sought to enjoin the defendants from proceeding with rulemaking under Act 21. The complaint alleged that by requiring the SPI and DPI to obtain the Governor's and the Secretary of Administration's approval to proceed with rule-making, Act 21 gives the Governor and the Secretary of Administration equal or superior authority to that of the SPI over the supervision of public instruction. Consequently, the complaint alleged that Act 21 violates Article X, section 1 of the Wisconsin Constitution and is inconsistent with our holding in Thompson.
¶ 10. Superintendent Evers filed an answer agreeing with Coyne; he has taken the same position as Coyne throughout this litigation. Governor Walker and Secretary Heubsch[8] filed a motion to dismiss the case for lack of standing. Prior to disposition of that motion, Coyne filed a motion for summary judgment. On April 6, 2012, the circuit court denied the Governor's motion to dismiss, and thereafter the Governor answered the complaint. On May 25, 2012, the Governor filed a motion for summary judgment and opposed Coyne's previously filed motion.
¶ 11. The circuit court denied the Governor's motion for summary judgment and granted Coyne's motion, concluding that "under the analysis set forth in Thompson, Act 21 as applied to this case violates the *458 Wisconsin Constitution." Accordingly, the circuit court declared void the provisions of Act 21 that "require approval of the Governor or the Secretary of the Department of Administration over the administrative rule-making activities in which the State Superintendent of Public Instruction engages or supervises, with respect to the supervision of public instruction."
¶ 12. The Governor appealed, arguing that administrative rulemaking is not a supervisory power of the SPI and that even if it were a supervisory power, the Legislature is free to "divvy up" the supervisory powers of the SPI among any "other officers" as it sees fit. Coyne, 361 Wis. 2d 225, ¶¶ 21, 25. Finally, the Governor argued that Act 21 does not impede the SPI's ability to make or authorize rules; thus, Act 21 does not place the Governor in a superior role to the SPI relative to rulemaking or public instruction. Id., ¶¶ 27, 29.
¶ 13. The court of appeals rejected each of these arguments and affirmed the circuit court. Id., f 36. The court of appeals noted that we previously held that rulemaking is a supervisory power of the SPI. Id., If 21-24 (citing Thompson, 199 Wis. 2d 674). It reasoned, "the practical effect of Act 21" is to give the Governor "the power to decide that there will be no rule or rule change on a particular subject, irrespective of the judgment of the SPI." Id., f 28. The court went on to highlight the tension Act 21 created between the Governor and the SPI: " [i]t seems beyond reasonable dispute that a Governor at loggerheads with an SPI over the content of a proposed rule . . . could use the threat to withhold approval as a means of affecting the rule content." Id., ¶ 35. As a result, the court of appeals concluded that Act 21 places the Governor in a superior position to the SPI as to the supervision of *459 public instruction; consequently, the court found the challenged provisions of Act 21 unconstitutional as applied to the SPI. Id., ¶ 36. The Governor appealed, and we granted review on June 12, 2015.
II. STANDARD OF REVIEW
¶ 14. We review a grant of summary judgment de novo, independently applying the same methodology as the circuit court and the court of appeals while benefitting from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶ 16, 360 Wis. 2d 129, 857 N.W.2d 136. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).
¶ 15. This case requires us to interpret Article X, § 1 of the Wisconsin Constitution. "We interpret provisions of the Wisconsin Constitution de novo." Polk Cty. v. State Pub. Def., 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994). This court turns to three sources to interpret provisions of the Wisconsin Constitution: "(1) the plain meaning of the words in the context used, (2) the historical analysis of the constitutional debates and of what practices were in existence [at the time the provision was drafted or amended]; and (3) the earliest interpretation of the provision by the Legislature as manifested in the earliest law passed following the adoption of the constitution." Id.
*460 III. DISCUSSION
A. Administrative Rulemaking
f 16. Prior to undertaking our constitutional analysis, it is important to explain what rulemaking is, the role that it plays in our system of government, and how Act 21 modified the rulemaking process.[9]
¶ 17. Agencies are governmental bodies created by the Legislature in order to facilitate the efficient functioning of government by implementing the policy decisions of the Legislature.[10] "Agency" is defined very broadly in Wisconsin: " Agency' means a board, commission, committee, department or officer in the state government, except the governor, a district attorney or a military or judicial officer." Wis. Stat. § 227.01(1). The DPI is a "department in the state government" created by the Legislature that is "under the direction and supervision of the state superintendent of public instruction."[11] Wis. Stat. § 15.37. The SPI is an "officer *461 in the state government" who is not the governor, a district attorney, or a military and judicial officer; thus, the SPI is also considered an "agency" to which Wis. Stat. ch. 227 applies.
¶ 18. In order to implement the policy decisions of the Legislature, the Legislature delegates to agencies, by statute, the power to promulgate administrative rules.[12] In 1943, the Legislature created Wis. Stat. ch. 227, entitled "Administrative Procedure and Re *462 view."[13] The Legislature sought to promote efficiency and create a uniform set of procedures administrative agencies were to follow when promulgating rules. Chapter 227 of the Wisconsin Statutes has henceforth prescribed the procedure agencies must follow to promulgate valid rules and regulations. See, e.g., Wis. Stat. §§ 227.0KD-.08 (1943-44); Wis. Stat. §§ 227.01(1)-.30 (2013-14).
¶ 19. A "rule" is defined by Wis. Stat. § 227.01(13) as "a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency."[14] Agencies generally must promulgate rules to take any action pursuant to the statutes they are tasked with administering unless the statute explicitly contains the threshold, standard, or requirement to be enforced.[15] All agencies are required to promulgate rules *463 to adopt general policies and interpretations of statutes that will govern the agency's enforcement or administration of that statute. Wis. Stat. § 227.10(1).[16] Additionally, an agency may not "implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with [Wis. Stat. ch. 227, subchapter II] . . . ." Wis. Stat. § 227.10(2m).
*464 1. Agency Rulemaking Prior to Act 21[17]
f 20. Prior to Act 21, the procedures that agencies were required to follow to promulgate a rule were as follows. Once an agency resolved to make a rule, the agency began the rulemaking process by preparing " a statement of the scope" of the rule. Wis. Stat. § 227.135(1). Among other things, the scope statement gives an overview of the proposed rule and the effect it is likely to have on entities and government resources. Wis. Stat. § 227.135(l)(a)-(f).
¶ 21. Once prepared, the agency sent a copy of the scope statement to the Legislative Reference Bureau for publication in the Administrative Register, and it sent another copy to the Secretary of Administration. Wis. Stat. § 227.135(3) (2009-10). The "individual or body with policy-making powers over the subject matter of a proposed rule" then had to approve the scope statement. Wis. Stat. § 227.135(2X2009-10).
f 22. After approval by the individual or body with policy-making powers, the agency could begin drafting the proposed rule. See Wis. Stat. §§ 227.135(2)-. 18 (2009-10). Once the drafting process was complete, the agency submitted the draft rule in its final form along with a detailed report about the proposed rule to the Legislature for review.[18] Wis. Stat. § 227.19(2)-(7)(2009-10).
*465 2. Rulemaking After Act 21
¶ 23. As relevant here, Act 21 significantly altered the rulemaking process by allowing the Governor, at his discretion, to halt the process at two key points: (1) after the agency has prepared a scope statement and (2) before the agency submits a draft rule to the Legislature for review.[19] See Wis. Stat. § 227.135(2); Wis. Stat. § 227.185. At either juncture— and regardless of the approval of the "individual or body with policy-making powers over the subject matter of a proposed rule" — the agency may not proceed with the rulemaking process unless the agency receives the Governor's written approval, which can be withheld for any reason or for no reason. Id.
B. Constitutional Challenges to Statutes
1 24. Coyne challenges the constitutionality of the aforementioned changes to Wis. Stat. ch. 227. Generally, there are two types of constitutional challenges to statutes: facial and as applied. Tammy W-G v. Jacob T, 2011 WI 30, ¶ 46, 333 Wis. 2d 273, 797 N.W.2d 854. In either case, the statute is presumed constitutional. See id., ¶¶ 46-48. A facial challenge "attacks the law itself as drafted by the legislature, claiming the law is void from its beginning to the end and that it cannot be constitutionally enforced under any circumstances." Soc'y Ins. v. LIRC, 2010 WI 68, ¶ 26, 326 Wis. 2d 444, 786 N.W.2d 385.
*466 ¶ 25. In an as applied challenge, the party does not attack the statute itself as unconstitutional; rather, the party claims that the statute has been applied to him or her in an unconstitutional manner. Id., ¶ 48. "The analysis of an as-applied challenge is determined by the constitutional right that is alleged to have been affected by the application of the statute."[20] Tammy W-G, 333 Wis. 2d 273, ¶ 49. Accordingly, in an as applied challenge, the court " assess [es] the merits of the particular case in front of us, 'not hypothetical facts in other situations.' " State v. Wood, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63 (quoting State v. Hamdan, 2003 WI 113, ¶ 43, 264 Wis. 2d 433, 665 N.W.2d 785).
¶ 26. The line between facial and as applied challenges is not always clear. Here, for example, Coyne's argument contains elements of both a facial and an as applied challenge. See League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶ 134 n.40, 357 Wis. 2d 360, 851 N.W.2d 302 (Abrahamson, C.J., dissenting). Coyne is attacking the law as it was drafted by the Legislature, claiming that the portion of Act 21 involving the process of drafting and promulgating administrative rules could never be constitutionally applied. But Coyne limits this claim as applying only to the SPI. We conclude that this is an as applied challenge to Act 21 because Coyne is not *467 claiming that the entirety of Act 21 can never be applied in any circumstance to any agency, but rather that Act 21 cannot be constitutionally applied to the SPI. See Soc'y Ins., 326 Wis. 2d 444, ¶ 26.
¶ 27. The dissents take issue with the procedural posture of this case, specifically commenting that "no proof has been submitted that either Wis. Stat. § 227.135(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent." Chief Justice Roggensack's dissent, ¶ 231; see also Justice Ziegler's dissent, ¶¶ 250-52. Contrary to the dissents' positions otherwise, Act 21 does not have to have been enforced for Coyne to properly bring a claim via a declaratory judgment action. Coyne properly seeks— through a declaratory judgment — that the court determine her "rights, status, and other legal relations" in a justiciable controversy. Wis. Stat. § 806.04(1).
¶ 28. The Uniform Declaratory Judgments Act, Wis. Stat. § 806.04, allows "controversies of a justi-ciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed." Olson v. Town of Cottage Grove, 2008 WI 51, ¶ 28, 309 Wis. 2d 365, 749 N.W.2d 211. We have explained,
A controversy is justiciable when the following four factors are present: (1) A controversy in which a claim of right is asserted against one who has an interest in contesting it. (2) The-controversy must be between persons whose interests are adverse. (3) The party seeking declaratory relief must have a legal interest in the controversy — that is to say, a *468 legally protectable interest. (4) The issue involved in the controversy must be ripe for judicial determination.
Id., ¶ 29. Governor Walker and Secretary Huebsch contested only the third factor in the courts below. They claimed that Coyne lacked a legally protectable interest in this controversy and thus had no standing to bring this action. See Coyne, 361 Wis. 2d 225, f 4. The court of appeals found that the Coyne parties had standing as taxpayers, id., ¶ 13, and Walker did not appeal that finding to this court.[21]
¶ 29. Justice Ziegler's assertion that this case is unripe for adjudication is also without merit due to the nature of a declaratory judgment action. See Justice Ziegler's dissent, ¶¶ 250-52. We examined the issue of ripeness in the context of the Declaratory Judgment Act in Olson, where we stated,
By definition, the ripeness required in declaratory judgment actions is different from the ripeness required in other actions. . . . potential defendants 'may seek a construction of a statute or a test of its constitutional validity without subjecting themselves to forfeitures or prosecution.' Thus, a plaintiff seeking a declaratory judgment need not actually suffer an injury before availing himself of the Act. What is required is that the facts be sufficiently developed to allow a conclusive adjudication.
309 Wis. 2d 365, ¶ 43 (internal citations omitted). The facts before this court are sufficiently developed to determine whether Act 21 violates the constitution *469 with respect the SPI. There are no details of any proposed rule or other facts that could come to light in the drafting process that would have any bearing on whether the contested portions of Act 21 violate Article X, § 1. The germane facts, namely, the constitutional provision and the text of the statutes, are already before us.
¶ 30. Consequently, this case is properly before us as an as applied challenge to the constitutionality of Act 21. See Waushara Cty. v. Graff, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992) ("Appellate courts need not and ordinarily will not consider or decide issues which are not specifically raised on appeal."). Coyne is, however, claiming that the statute as written can never be constitutionally applied to the SPI. Thus, the burden of proof Coyne must meet is that the application of Act 21 to the SPI is unconstitutional beyond a reasonable doubt. Soc'y Ins., 326 Wis. 2d 444, ¶ 27.
C. Rulemaking, Supervision, and the Language of Article X
1. Rulemaking Is A Supervisory Power.
¶ 31. We first address whether rulemaking is a supervisory power of the SPI and DPI. Article X, § 1 states, " [t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law." The SPI's and DPI's powers and duties are "prescribed by" the Legislature and found throughout Wis. Stat. chs. 115-121. If rulemaking is not a supervisory power, then there is no constitutional *470 impediment to Act 21 because it would not affect the supervision of public instruction.[22]
¶ 32. Coyne argues that because rulemaking has been part of the SPI's supervisory power since statehood, it is an "essential aspect" of the SPI's constitutional duty to supervise public instruction. In contrast, the Governor claims that rulemaking cannot be a supervisory power because of its "legislative nature." We find neither argument persuasive. Because the SPI is vested with the "supervision of public instruction," a "supervisory power" is one without which the SPI could not carry out his legislatively-mandated duties of supervision of public instruction. Put simply, the real question is whether the Legislature requires the SPI and DPI to supervise public instruction through rule-making.
¶ 33. As agencies, the SPI and DPI are both bound by Wis. Stat. ch. 227. This means they are statutorily required by the Legislature to engage in rulemaking in order to "implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency." Wis. Stat. § 227.10(2m). The SPI and DPI cannot take any legally binding action pursuant to any of the statutes they are tasked with administering without making rules unless the statute specifically provides for another course of action. Id. Because rulemaking is the only means by which the SPI and the DPI can currently perform most of their legislatively-mandated *471 duties of supervision of public instruction,[23] rulemak-ing is a supervisory power that the DPI and SPI must use to supervise public instruction.
¶ 34. Article X, § 1 states, " [t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law." Though we have never interpreted the phrase " shall be prescribed by law" in specific reference to Article X, " [t]his court has consistently stated that the phrase 'prescribed by law in art. VI, § 3 plainly means prescribed by statutory law." State v. City of Oak Creek, 2000 WI 9, ¶ 19, 232 Wis. 2d 612, 605 N.W.2d 526. Neither reason nor precedent leads us to interpret this same phrase differently in this provision.
¶ 35. The Legislature has "prescribed by law" the SPI's and DPI's duties and powers of supervision of public instruction in Wis. Stat. chs. 115-121. By enacting Wis. Stat. § 15.37, the Legislature has "prescribed by law" that the SPI oversee the DPI. It has also "prescribed by law" that the SPI and DPI are agencies bound by Wis. Stat. ch. 227. See Wis. Stat. § 227.01(1). Further, the Legislature has "prescribed by law" that the SPI and DPI must engage in rulemaking. See, e.g., infra n.39; Wis. Stat. §§ 227.10. Thus, rulemaking is a supervisory power because it is the means by which the Legislature has prescribed the SPI and DPI to carry out the majority of their statutorily-mandated duties and powers. Stated otherwise, rulemaking is the means by which the Legislature has "prescribed by *472 law" that the SPI must carry out his Legislatively-defined duties of supervision.
¶ 36. To be clear, rulemaking is not a constitutional power of the SPI. Article X, § 1 "is not [a provision] which incorporates an ancient common law office [such as the sheriff], possessing defined powers and duties, into the constitution." Fortney v. Sch. Dist. of W. Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982). There were no common law duties and powers that the SPI or any other officers of supervision of public instruction had traditionally possessed prior to the adoption of the Wisconsin Constitution because neither the office of the SPI nor a uniform system of public instruction existed prior the adoption of our constitution in 1848. See id.
¶ 37. Consequently, any rulemaking power the SPI and DPI has is clearly a delegation of power from the Legislature, not from the constitution. However, under the current statutory prescription, the SPI and DPI cannot carry out their duties and powers of supervision without rulemaking. See Wis. Stat. § 227.10; see also infra n.39. Accordingly, under the current Legislative prescription of the SPI's powers and duties of supervision of public instruction, rule-making is a supervisory power.
2. The Legislature May Delegate Supervision of Public Instruction Only to Officers of Supervision of Public Instruction.
¶ 38. We next address the argument that even if rulemaking is a supervisory power, the Legislature is free to divide that power among any "other officers" it chooses pursuant to Article X, § 1 of the Wisconsin *473 Constitution. Both parties spent a substantial amount of effort arguing about the applicability and validity of our decision in Thompson, in which we held that the Legislature must maintain the superiority of the SPI over the "other officers" in whom supervision of public instruction is vested. 199 Wis. 2d 674. Thus, we begin with a discussion of Thompson.
a. Thompson v. Craney
¶ 39. Thompson's examination of Article X, § 1 is instructive to our analysis here, and much of what was said there applies to this case because we are interpreting the same constitutional provision under similar circumstances. However, this case poses a different constitutional question than the question posed in Thompson. In Thompson, the Legislature had redistributed nearly all of the SPI's powers of supervision of public instruction among other officers whose roles all related to the supervision of public instruction: a new Department of Education, a new Education Commission, and a new Secretary of Education. Id. at 678-79 (emphasis added). There, the question was not whether those officers could constitutionally be vested with the supervision of public instruction at all, but rather, whether the constitution allowed such "other officers" of supervision of public instruction to be given equal or greater authority over the supervision of public instruction than the SPI. Id.
¶ 40. In contrast, here, the Legislature is attempting to give officers who are not officers of supervision of public instruction the ability to prevent the SPI from promulgating rules. Thus, the question in this case is whether the term "other officers" in Article X, § 1 allows some supervision of public instruction to be vested in any other officers the Legislature chooses, *474 including other constitutional officers whose offices were not created to supervise public instruction.
¶ 41. In short, there are two questions a court must consider. The first is whether the Legislature vested the supervision of public instruction in a proper "other officer." If the Legislature did not, then the analysis ends. If the Legislature did, then, under Thompson, we proceed to consider whether that "other officer" has been given equal or greater authority over the supervision of public instruction than the SPI. The Thompson court only addressed the second question, but we must address the first. Thus, although much of Thompson's general discussion of Article X, § 1 applies to this case, Thompson does not answer the precise constitutional question before us. Accordingly, we proceed to consider the first question left unanswered by Thompson: whether the Legislature vested the supervision of public instruction in a proper "other officer."
b. General Principles Governing the Interpretation of a Constitutional Provision
¶ 42. "The surest guides to a proper interpretation of [Article X, § 1] are the constitutions of 1846 and 1848, the 1902 amendment, the accompanying debates, our legislature's first laws following adoption, and this court's prior interpretation of Article X, § 1." Thompson, 199 Wis. 2d at 698. Applying this approach, we begin by looking at the language of Article X, § 1 when it was adopted in 1848 and when it was amended in 1902. See Polk Cty., 188 Wis. 2d at 674. First adopted in 1848, Article X, § 1 stated,
The supervision of public instruction shall be vested in a state superintendent, and such other officers as the legislature shall direct. The state superintendent shall *475 be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.
In 1902, Article X, § 1 was amended to read,
The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for four years from the succeeding first Monday in July. The state superintendent chosen at the general election in November, 1902, shall hold and continue in his office until the first Monday in July, 1905, and his successor shall be chosen at the time of the judicial election in April, 1905. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.
Small, non-substantive changes were made by amendment in 1982; these changes included removing the word "his" from before the word "office," changing the word "four" to "4," and removing the sentence about the 1902 and 1905 elections.
¶ 43. "The purpose of construing a constitutional amendment 'is to give effect to the intent of the framers and of the voters who adopted it.' " Appling v. Walker, 2014 WI 96, ¶ 19, 358 Wis. 2d 132, 853 N.W.2d 888 (citing State v. Cole, 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328). "To determine what the framers and the voters wanted the consti *476 tutional provision to accomplish we first look at the plain language and meaning of the amendment they ratified." Appling, 358 Wis. 2d 132, ¶ 22. It is a paramount rule of constitutional construction that the intent of a provision "is to be ascertain[ed], not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole[.]" Kayden Indus., Inc. v. Murphy, 34 Wis. 2d 718, 730, 150 N.W.2d 447 (1967) (quoting State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 184, 204 N.W. 803, 805 (1925)).
¶ 44. When we examine the constitution as a whole, we conclude that Article X, § l's reference to "other officers" means officers of supervision of public instruction other than the SPI. Article X is titled "Education," and the eight sections that lay within Article X form the foundation of Wisconsin's public education system. It follows then that the most logical interpretation of Article X, § 1 is that "other officers" means "other officers" whose offices relate to supervising education, i.e., other officers of supervision of public instruction.
c. The Plain Language Of Article X, Section 1.
¶ 45. The structure and language of Section 1 itself supports our interpretation as well. When the plain language of Article X, § 1 is read within the context of the entire section, it becomes clear that the "other officers" in whom the Legislature may vest the supervision of public instruction are other officers of supervision of public instruction.
¶ 46. When the same word or phrase appears twice in the same statute or provision, we attribute the same definition to that word or phrase. See Daimler- *477 Chrysler v. LIRC, 2007 WI 15, ¶ 29, 299 Wis. 2d 1, 727 N.W.2d 311 ("It is a basic rule of construction that we attribute the same definition to a word both times it is used in the same statute or administrative rule."). The only officers mentioned in Section 1 are the superintendent and the "other officers." The second sentence of Section 1 refers only to the superintendent.[24] The final sentence of Article X, § 1 refers to "all other officers of supervision of public instruction." (Emphasis added.) Thus, the most reasonable construction of Section 1 — as a whole — is that the term "all other officers" in the last sentence of Section 1 is referring to "all officers authorized by Article X, § 1 other than the superintendent." The final sentence specifically states that these "other officers" are "other officers of supervision of public instruction." It would defy our basic principles of construction to conclude that the drafters of Article X, § 1 were referring to different "other officers" in the first sentence than in the last, particularly when read in context with the rest of Section 1. See, e.g., State v. Cole, 2003 WI 112, ¶ 13, 264 Wis. 2d 520, 665 N.W.2d 328 ("In interpreting a constitutional provision, we first turn to the plain meaning of the amendment in context").
¶ 47. Further evidence that the "other officers" referred to in Article X, § 1 were intended exclusively to be other officers of supervision of public instruction is found throughout Section 1. The Legislature is empowered to define the qualifications, powers, duties, compensation, term of office, and time and manner of *478 selection of all "other officers" authorized by Article X. The very existence of their offices is dependent upon the Legislature. With this in mind, the most straightforward interpretation of "such other officers as the Legislature may direct" is that the "other officers" are meant to be "creatures of the Legislature" whose offices were created to supervise public instruction. See, e.g., City of Sun Prairie v. Davis, 226 Wis. 2d 738, ¶¶ 29-31, 595 N.W.2d 635 (1999) (nothing that although municipal courts are authorized by the constitution, they exist only if the Legislature creates them; thus, they are "creatures of the legislature" with no inherent powers).
¶ 48. Another indication that the "other officers" in Article X, § 1 must be other officers of supervision of public instruction is found in the provision for a state superintendent. See Thompson, 199 Wis. 2d at 698-99. The first portion of Article X, § 1 vests supervision of public instruction in " a state superintendent and such other officers as the legislature may direct." The constitution does not define "superintendent," so we look to a dictionary from around the time of the provision's adoption to determine the common, ordinary meaning of the word at the time of the adoption of the constitution. See Xcel Energy Servs., Inc. v. LIRC, 2003 WI 64, ¶ 32, 349 Wis. 2d 234, 833 N.W.2d 665. A superintendent is "[o]ne who has the oversight and charge of something, with the power of direction."[25]
¶ 49. The Legislature must vest the supervision of public instruction in officers over whom the SPI has "oversight and charge with the power of direction," or by definition he is no longer the superintendent of *479 public instruction.[26] See Thompson, 199 Wis. 2d at 698-99. Article X, § 1 gives the Legislature the freedom to shape and reshape a system of public education that fits the needs of the people of our State at any given time. See id., see also Thompson, 199 Wis. 2d at 701-02 (Wilcox, J., concurring). To that end, the Legislature is free to create or eliminate the positions of whatever "other officers" of supervision of public instruction it wants. The Legislature may also grant, withhold, or take away those officers' powers and duties as it sees fit. However, supervision of public instruction must remain in the hands of officers whose activities the SPI oversees and directs; otherwise, the SPI is no longer supervising public instruction, which would constitute a violation of Article X, § 1. See Thompson, 199 Wis. 2d at 698-99.
¶ 50. The argument remains, however, that "other officers" and "other officers of supervision of public instruction" are different terms, and thus "other officers" in the first sentence must have a different meaning than "other officers" in the last sentence. We cannot conclude that the plain language of Article X, § 1 unambiguously precludes this interpretation, so we move on to our second source of constitutional interpretation: the constitutional debates and practices in *480 existence at the time of the writing of the constitutional provision. Polk Cty., 188 Wis. 2d at 674.
d. The Constitutional Debates Regarding Article X.
¶ 51. When interpreting a constitutional provision we do not rest our analysis on the language of the provision alone. Rather, we also consult the constitutional debates and the practices in existence at the time of the writing of the constitutional provision and the interpretation of the provision by the Legislature as manifested in the laws passed following its adoption. Id. Both the constitutional debates and the laws passed following the adoption of Article X, § 1 and the 1902 amendment show that the "other officers" authorized by the provision were meant to be officers of supervision of public instruction whose positions were created by the Legislature exclusively for that purpose.
¶ 52. As originally proposed in 1846, Article X, § 1 read:
The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature may direct. The state superintendent shall be chosen by the electors of the state once in every two years. The legislature shall provide for filling vacancies in the office of state superintendent and prescribe his powers and duties.
The Convention of 1846, 538 (Milo M. Quaife, ed., 1919) available at https://books.google.com/books? id=EYOUAAAAYAAJ&printsec=titlepage&source= gbs_summary_r&hl=en#v=onepage&q&f=false (hereinafter The Convention of 1846). The proposed constitution of 1846 was not adopted, and another conven *481 tion was called in 1847. The Attainment of Statehood, VI-VIII, (Milo M. Quaife, ed. 1928). The wording of the 1846 provision was largely retained; the only changes made were regarding the method of selection of the superintendent. See Thompson, 199 Wis. 2d at 686.
¶ 53. As this court recognized in Thompson, discussion of the role or powers of the "other officers" mentioned in Article X is completely absent from the constitutional debates of 1846 and 1848.199 Wis. 2d at 687; see also Conrad Patzer, Public Education in Wisconsin 17-27 (1925); Journal and Debates, reprinted in The Attainment of Statehood, (Milo M. Quaife, ed., 1928). The debates focused mainly on the other sections of the Article and the importance of the superintendent. The phrase "such other officers as the legislature shall direct" went virtually unchallenged. Thompson, 199 Wis. 2d at 687.
¶ 54. However, two defeated proposals regarding the superintendent from the 1846 debates indicate that the framers envisioned the "other officers" in Article X, § 1 to be officers of public instruction whose offices were created by the Legislature. One delegate to the 1846 convention sought to amend Section 1 by eliminating the superintendent altogether. His proposed amendment read "[t]he supervision of public instruction shall be vested in such officers as shall hereafter be created by law." The Convention of 1846, 568. Another delegate thought that the superintendent was unnecessary and that "the duties [of supervision of public instruction] for a time might be done by the secretary of state or some other officer already provided for, leaving to the legislature to provide for this office when the time came." Id.
*482 ¶ 55. The framers of the 1846 constitution rejected a model where the supervision of public instruction was vested in "other officer[s] already provided for," and all other proposed amendments to the section always left it to the Legislature to provide for new officers to supervise public instruction. The framers decided that a superintendent was crucial and rejected both proposals, but clearly they were considering a system where the supervision of public instruction was vested in a superintendent and officers whose offices were created for that purpose. That the "other officers" were intended to be officers of supervision of public instruction was never in contention.
¶ 56. Moreover, the history of the 1902 amendment to Article X, § 1 indicates that the drafter of the amendment and those who ratified it also understood the "other officers" to be other officers of supervision of public instruction. The 1902 amendment, which substantially provided Article X, § 1 as we know it today, was drafted and supported by then-Superintendent of Public Instruction Lorenzo Dow Harvey. See Conrad Patzer, Lorenzo Dow Harvey, 93 (1936). Harvey was concerned that local, elected county superintendents had been using the office for political gain rather than for furthering the cause of education, so he introduced the amendment in order to allow the Legislature to provide for the appointment of local public instruction officials. See id. at 93; see also Thompson, 199 Wis. 2d at 691-92. Additionally, Harvey was concerned with ensuring that there was enough flexibility to overhaul the public school system, as Justice Wilcox pointed out in his concurrence in Thompson. 199 Wis. 2d at 702-03 (Wilcox, J., concurring).
¶ 57. Our review of the history of the drafting of the 1902 amendment reveals that like the drafters of *483 the original provision, Harvey only ever contemplated the Legislature vesting the supervision of public instruction in officers whose offices were created by the Legislature for that purpose. See Thompson, 199 Wis. 2d at 690-693; see also Thompson, 199 Wis. Stat. § at 701-05 (Wilcox, J., concurring); Conrad Patzer, Lorenzo Dow Harvey, 93-95. Harvey's stated purpose of amendment was to allow the Legislature to appoint public instruction officers, if necessary, in order to ensure that the officers supervising public instruction were dedicated solely to the task of education rather than using the office as a political stepping stone. In fact, it was Harvey who added the "other officers of supervision of public instruction" language to the section. It strains credulity to accept that Harvey intended Article X, § 1 to allow the Legislature to vest the supervision of public instruction in officials who are not officers of supervision of public instruction when he is the person who added that language to Section 1.
e. The First Laws Interpreting Article X, Section 1.
¶ 58. We next turn to our third source of interpreting a constitutional provision. We examine the " earliest interpretation of the provision by the legislature as manifested in the earliest law passed following the adoption of the constitution." Polk Cty., 188 Wis. 2d at 674. Thus, we look to the first laws passed vesting the supervision of public instruction in "other officers." The constitution does not define "supervision," so we again look to a dictionary from around the time of the provision's adoption to determine the common, ordinary meaning of the word "supervision" at the time of *484 the adoption of the constitution.[27] See Xcel Energy Servs., Inc., 349 Wis. 2d 234, ¶ 32. "Supervision" is defined as " [t]he act of overseeing; inspection; superintendence."[28]
¶ 59. The first laws regarding "overseeing, inspection, or superintendence" of public instruction passed by the Legislature of 1848 defined the powers and duties of the SPI and created the office of "town superintendent of common schools." See Laws of 1848, 127-29;[29] Laws of 1848, 209. The duties of the town superintendent of common schools included qualifying teachers, examining the condition of schools, and advising on the course of studies to be pursued. See Laws of 1848, 219, Sec. 1-2. The town superintendent of common schools was "in all cases under the control and direction of the state superintendent of public instruction." Laws of 1848, 219, Sec.3.
¶ 60. The Legislature also enacted an "Act in relation to Public Schools," which created the school district system, school district officers, district boards, and town boards of school inspectors. Laws of 1848, 226-47. The SPI, the town superintendent, and the *485 district officers and boards were entrusted with all functions of the public schools. Id. All of these officers whom the Act vested with the supervision of public instruction are, aside from the SPI, officers whose positions the Legislature created for the purpose of supervising public instruction.[30] See Laws of 1848, 127-29, 226-47. The Legislature created county superintendents of schools in 1866. See, e.g., Laws of 1866, Chapter 111. Some Legislatures created city boards of education and city superintendents to supervise public instruction in the cities; these officers wielded the powers of supervision that would have otherwise been vested in the county superintendent. See, e.g., Laws of 1865, Chapter 268, 361-363 (creating a board of education to supervise public instruction in the city of Appleton). The common thread between these "other officers" is that they all are officers of public instruction whose offices the Legislature created for the purpose of supervising public education.
¶ 61. Similar to the Legislature's actions following the adoption of the 1848 constitution, the Legislature first interpreting the 1902 amendment to Article X, § 1 routinely and exclusively vested the supervision of public instruction in officers of supervision of public instruction. The Legislature provided the qualifications, powers, duties, and compensation of the SPI in the Laws of 1903, Chapter 37, 54. The Legislature reintroduced the office of the County Superintendent of Common Schools and the city superintendents were retained. Laws of 1903, Chapter 307, 480; see also Wis. Stat. ch. 27 sec. 461 (1911) (assigning duties of county superintendents that included licensing teachers, examining schools in his district, and advising on meth *486 ods and courses of instruction). The Legislature established the township system of school government in the towns of Hiles and Laona. Laws of 1903, Chapter 36, 50. School boards in large cities were given the power to establish schools and hire support staff. Laws of 1903, Chapter 101, 150. In sum, the first laws passed after the 1902 amendment to Article X, § 1 reflect that Legislature's understanding that "other officers" meant other officers of supervision of public instruction,[31]
¶ 62. In fact, the Legislature's vesting of supervision of public instruction solely in officers of supervision of public instruction has continued in an unbroken line from the founding of our State in 1848 to the present. We were unable to find a single instance in which the Legislature of this State gave supervision of public instruction to officers whose office was not dedicated to supervising public education.[32] Even when the Legislature attempted to restructure the entire system of public instruction with the law at issue in Thompson, it created new offices of supervision of public instruction such as a Department of Education. See Thompson, 199 Wis. 2d at 678-79. To be clear, the Legislature has never attempted to vest the supervision of public instruction in "other officers" whose offices — like the Governor's — were not devoted to that *487 task, and that is how we have uniformly interpreted "such other officers as the legislature shall direct" as well.[33]
¶ 63. In sum, "[t]he surest guides to a proper interpretation of [Article X, § 1] are the constitutions of 1846 and 1848, the 1902 amendment, the accompanying debates, our legislature's first laws following adoption, and this court's prior interpretation of Article X, § 1." Thompson, 199 Wis. 2d at 698. Our review of these sources leads us to a single conclusion: that the "other officers" in whom the Legislature may vest the supervision of public instruction must be other officers of supervision of public instruction. It is self-evident that neither the office of the Governor nor that of the Secretary of Administration were created by the Legislature as officers of supervision of public instruction. Accordingly, the Legislature may not delegate to the Governor or the Secretary of Administration the power *488 to "oversee, inspect, or superintend" public instruction. To do so would result in the unconstitutional vesting of the supervision of public instruction in an officer who is not an officer of supervision public instruction.
D. Act 21 And Supervision of Public Instruction.
¶ 64. Having determined that rulemaking is a supervisory power granted to the SPI and DPI by the Legislature and that the supervision of public instruction may not be vested in the Governor or the Secretary of Administration, the remaining question is whether Act 21 vests the Governor and the Secretary of Administration with the supervision of public instruction. Act 21 did not remove or reduce the rule-making powers of the SPI or DPI. Accordingly, the issue here is whether the power to halt the rulemaking of the SPI and DPI vests the Governor and Secretary of Administration with the supervision of public instruction.
¶ 65. We hold that it does. By giving the Governor the power to prevent the SPI's and DPI's proposed rules from being sent to the Legislature, Act 21 gives the Governor the authority to "oversee, inspect, or superintend" public instruction. Indeed, Act 21 gives the Governor the power to decide upon the very existence of any rules on all topics regarding the supervision of public instruction. The Secretary of Administration holds this same power if the rule at issue meets the conditions set forth in Wis. Stat. § 227.137(6). Accordingly, Act 21 vests the Governor and the Secretary of Administration with the supervision of public instruction.
I 66. As discussed previously, rulemaking is the primary means by which the SPI and DPI must carry *489 out their legislatively-mandated duties. The SPI and DPI are statutorily required to promulgate rules in order to adopt any statement of general policy and any interpretation of a statute "to govern [their] enforcement or administration of that statute," as well as to "implement or enforce any standard, requirement, or threshold" unless the same is explicitly required or permitted by statute. Wis. Stat. § 227.10(1), (2m). Additionally, the "Education" chapters of the statutes, Wis. Stat. chs. 115-121, mandate no less than 71 times[34] that the SPI or DPI make rules on various subjects ranging from the licensing of teachers to the commencement of the school term.[35] This number does not even include the statutes the SPI and DPI are tasked with administering that do not include a command to promulgate a rule. Under the current legislative prescription, the SPI and DPI cannot supervise *490 public instruction without rulemaking. Pursuant to Act 21, they cannot promulgate rules without the approval of the Governor. Consequently, Act 21 beyond a reasonable doubt unconstitutionally vests the supervision of public instruction in the Governor.
¶ 67. The Governor contends that Act 21 does not vest the Governor with the supervision of public instruction because it does not transfer the power to make rules regarding public instruction to the Governor and Secretary of Administration, nor does it infringe upon the SPI's ability to approve or deny the DPI's scope statements. We disagree. The essence of supervision includes the power to prevent an action at one's discretion. While Act 21 does not give the Governor the power to promulgate rules regarding public instruction, it does give the Governor the power "in his or her discretion"[36] to decide that "there will be no rule on a given subject irrespective of the judgment of the SPI." Coyne, 361 Wis. 2d 225, ¶ 29.
¶ 68. It is granting the Governor and Secretary of Administration the power to make the decision on whether the rulemaking process can proceed that causes the constitutional infirmity. This unchecked power to stop a rule also gives the Governor the ability to supplant the policy choices of the SPI. Like the court of appeals, we believe that "a Governor at loggerheads with an SPI over the content of a proposed rule, or a proposed rule change, could use the threat to withhold approval as a means of affecting the rule content." Id., ¶ 35. For example, the Governor could refuse to approve a scope statement or a rule until it met the Governor's specifications.
*491 ¶ 69. This does not mean the Governor and the Secretary of Administration cannot be involved in the rule-drafting process at all; it simply means that they cannot be given the authority to halt the process. The Legislature can require whatever rulemaking steps it wants as long as the SPI and DPI are able to make the final decision on the contents of a proposed rule and submit that proposed rule to the Legislature at the end of the process. For example, there is no constitutional infirmity in requiring the SPI and DPI to prepare the economic impact analysis and submit it to the Secretary of Administration and the Governor as long as those officers are not permitted to block the rule from being submitted to the Legislature. Additionally, the Legislature could require the SPI to submit the draft rule to the Governor and allow the Governor to send the rule back to the SPI with requested changes (provided the SPI is not required to incorporate them). The Legislature could further require the SPI to hold additional hearings on the Governor's proposed changes, to prepare a detailed report on the Governor's proposed changes and a report on why the SPI does not agree with them, to have a personal consultation with the Governor, or to resubmit the rule to the Governor to get his written opinion on it and submit that opinion to the Legislature along with the draft rule. The Legislature can create whatever rulemaking process it sees fit, as long as at the end of the process the SPI and DPI are able to decide on the final content of a proposed rule and submit that proposed rule to the Legislature.[37]
¶ 70. Additionally, the constitution gives the Legislature control over what powers the SPI and the *492 other officers of supervision of public instruction possess in order to supervise public instruction. As a result, the Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction. If the Legislature does not believe the SPI should engage in rulemaking, it is free to change the statutory scheme so that the SPI and DPI can carry out the duties with which they are tasked through other means and are not required to promulgate rules. Moreover, it could change the duties with which they are tasked, or it could provide all of the definitions, standards, requirements, thresholds, and terms or conditions of any licenses issued by the SPI and DPI by statute. What it cannot do is require the SPI and DPI to supervise public instruction through rulemaking and then condition rulemaking on the approval of an officer who is not an officer of supervision of public instruction.
¶ 71. Accordingly, the constitutional problem with Act 21 is that it contains no mechanism for the SPI and DPI to proceed with rulemaking in the face of withheld approval by the Governor or Secretary of Administration. Had the Legislature provided some means for the SPI and DPI to continue the rulemaking process if the Governor or the Secretary of Administration did not approve the rule, the supervision of public instruction would remain with the SPI and DPI. However, as currently written, Act 21 gives the Governor and Secretary of Administration the unchecked power to halt the SPI's and DPI's promulgation of rules on any aspect of public instruction, ranging from teachers' qualifications to the implementation of the school milk program to nonresident waiting list re *493 quirements for pupils.[38] In other words, Act 21 improperly vests the Governor and Secretary of Administration with the supervision of public instruction in violation of Article X, § 1. Consequently, the portions of Act 21 allowing the Governor and Secretary of Administration to halt the rulemaking process are void as applied to the SPI and his subordinates.
E. The Reasons the Dissents and the Lead Reach a Different Conclusion.
¶ 72. Now that we have fully presented our interpretation of Article X, § 1, we turn to discuss a few of the points made in Chief Justice Roggensack's and Justice Ziegler's dissents. We begin with a brief summary of our analysis. First, Article X, § 1 states that "the supervision of public instruction shall be vested in a state superintendent" and in "other officers of supervision of public instruction." Thus, the constitution grants the SPI the power to supervise public instruction. Second, Article X, § 1 states that the SPI's "qualifications, powers, duties, and compensation shall be prescribed by law." This means the Legislature has the power to fill in the details as to what supervision entails. The Legislature has required the SPI to supervise public instruction through rulemaking. Consequently, rulemaking is how the SPI exercises his power to supervise public instruction. Under Act 21, the Legislature has taken the SPI's power to supervise via rulemaking and conditioned it on the approval of the Governor. The Governor is not an "officer of supervision or public instruction;" therefore, the Legislature cannot vest him with the supervision of public instruction.
*494 ¶ 73. The main problem with the dissents' analy-ses are their singular focus on only half of Article X, § 1. Both dissents emphasize the phrase "and their qualifications, powers, duties, and compensation shall be prescribed by law." However, a meaningful interpretation of Article X, § 1 should focus on two equally important phrases: (1) "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct," and (2) "and their qualifications, powers, duties and compensation shall be prescribed by law."
¶ 74. While Article X, § 1 gives the Legislature the broad authority to both create "other officers of supervision of public instruction" and to outline those officer's "qualifications, powers, duties and compensation," Article X, § 1 also places some limits on the Legislature's power. Per the words of Article X, § 1, the "other officers" the Legislature creates must be "other officers of supervision of public instruction." Additionally, the plain language of Article X, § 1 demands that " [t]he supervision of public instruction [] be vested in a state superintendent and such other officers." Chief Justice Roggensack's and Justice Ziegler's dissents refuse to recognize these limitations.
¶ 75. First, neither Chief Justice Roggensack's dissent nor Justice Ziegler's dissent attempt to address the question at the heart of the controversy in this case: in whom may the Legislature vest the supervision of public instruction? Indeed, Chief Justice Roggensack remarks, " [t]he matter before us does not concern the 'other officers' mentioned in Article X, § 1." Chief Justice Roggensack's dissent, f 227. And Justice Ziegler comments, " [I]t is not really the Governor who is supervising (or even obstructing, if one prefers) the actions of the SPI; it is the Legislature." *495 Justice Ziegler's dissent, ¶ 247. Our response to both is simply this: how is it not? How does the matter before us not concern the "other officers" mentioned in Article X, § 1? And how is the Governor not supervising public instruction and the SPI when he is the one who halts the rulemaking process? If neither Chief Justice Roggensack nor Justice Ziegler will recognize that the constitution places a limit on who the Legislature may vest the supervision of public instruction in, then we can never reach the same conclusion despite agreeing on many legal principles.[39]
f 76. Second, neither dissent is willing to acknowledge the constitution's instruction that "[t]he supervision of public instruction [] be vested in a state superintendent and such other officers as the legislature shall direct." Both Chief Justice Roggensack's dissent and Justice Ziegler's dissent instead immediately proceed to focus exclusively on the Legislature and its ability to outline the SPI and the "other officers" "qualifications, powers, duties and compensation." Because both dissents skip over the clause that vests supervision of public instruction in the SPI and "other officers," and instead only look at the "pre *496 scribed by law" clause, both dissents read our opinion as stripping the Legislature of its power under Article X, § 1. For example, Chief Justice Roggensack remarks that our opinion "reduces the constitutional power of the legislature to control its delegations of legislative power in rulemaking." Chief Justice Roggensack's dissent, ¶ 229. And according to Justice Ziegler, our conclusion in this case gives "unfettered" authority to the SPI and the "other officers." See Justice Ziegler's dissent, f 248.
¶ 77. These allegations are simply not true. As we explained earlier in this opinion, our determination in this case "does not mean the Governor and the Secretary of Administration cannot be involved in the rule-drafting process at all... . the Legislature can require whatever rulemaking steps it wants as long as the SPI and DPI are able to make the final decision on the contents of a proposed rule and submit that proposed rule to the Legislature at the end of the process." See infra ¶ 69. Moreover, we noted "[T]he Legislature may give, may not give, and may take away the powers and duties of the SPI and the other officers of supervision of public instruction. If the Legislature does not believe the SPI should engage in rulemaking, it is free to change the statutory scheme . . . ." See infra f 70.
¶ 78. To summarize, unlike Chief Justice Roggensack's Justice Ziegler's dissents, we have attempted to meaningfully interpret two equally important phrases: (1) "The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct," and (2) "and their qualifications, powers, duties and compensation shall be prescribed by law." If one chooses to address only half of the question presented, as both *497 dissents have done, or chooses to emphasize only one of these two phrases, as both dissents have done, then we can never reach the same conclusion regardless of our agreement on many legal principles.
IV. CONCLUSION
¶ 79. Our constitution is the true expression of the will of the people: it must be adopted by the people of this State, and if it is to be changed, it must be ratified by the people of this State. By adopting our constitution, the people of Wisconsin gave the Legislature broad discretion to define the powers and duties of the Superintendent of Public Instruction and the other officers of public instruction. However, the will of the people as expressed by Article X, § 1 also requires the Legislature to keep the supervision of public instruction in the hands of the officers of supervision of public instruction. To do otherwise would require a constitutional amendment. Because Act 21 does not allow the SPI and DPI to proceed with their duties of supervision without the Governor's, and in some circumstances the Secretary of Administration's approval, Act 21 unconstitutionally vests the Governor and Secretary of Administration with the supervision of public instruction in violation of Article X, § 1. Accordingly, the court of appeals is affirmed.
By the Court. — The decision of the court of appeals is affirmed.

 Coyne v. Walker, 2015 WI App 21, 361 Wis. 2d 225, 862 N.W.2d 606.

 The Honorable Amy Smith, presiding.

 After we accepted the petition for review in this case Scott Neitzel replaced Huebsch as the Secretary of Administration. Consequently, on June 18, 2015, Huebsch was removed from the caption and Neitzel was added as a defendant-appellant-petitioner.

 To begin the rule-drafting process, agencies must prepare a scope statement that, among other things, describes the objectives, policies, authority, and use of government resources that the rule may affect. See Wis. Stat. § 227.135(1).

 Wisconsin Stat. § 227.137(7) requires the Secretary of Administration to approve the rule if the "agency has adequately addressed the issues raised during the department [of *456 administration]'s review of the rule," but the determination of whether the agency has "adequately addressed the issues" is left to the discretion of the Secretary of Administration.

 Specifically, Wis. Stat. § 227.185 states,
After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval. The governor, in his or her discretion, may approve or reject the proposed rule. If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval. No proposed rule may be submitted to the legislature for review under s.227.19(2) unless the governor has approved the proposed rule in writing.

 Peggy Z. Coyne and Mary Bell are taxpayers and school teachers who are the current presidents of Madison Teacher Inc., the labor organization that represents most employees of the Madison Metropolitan School District, and the Wisconsin Education Association Counsel, a labor organization representing thousands of teachers throughout Wisconsin, respectively. Corey Otis and Jane Weidner are taxpayers and teachers in Wisconsin public schools. Kristin A. Voss, Marie K. *457 Stangel, and Mark W. Taylor are taxpayers and parents whose children attend and receive services from Wisconsin public schools.

 For ease of reading, we will refer mainly to the Governor, though our analysis and conclusion apply with equal force to the Secretary of Administration.

 Administrative rulemaking is a complicated process, and we do not endeavor to explicate the required steps for each agency nor the requirements of each subdivision of Wis. Stat. ch. 227. We merely provide a general summary of the process.

 See generally Wis. Stat. § 227.19(l)(b) ("The legislature recognizes the need for efficient administration of public policy. . . . The delegation of rule-making authority is intended to eliminate the necessity of establishing every administrative aspect of general public policy by legislation."); Wis. Stat. ch. 15, Structure of the Executive Branch; Wis. Stat. § 15.001(2)(a) ("As the chief administrative officer of the state, the governor should be provided with the administrative facilities and the authority to carry out the functions of the governor's office efficiently and effectively within the policy limits established by the legislature.").

 The DPI is the administrative agency that interprets, implements, administers, and enforces the statutes in Wis. *461 Stat. chs. 115-121 governing the supervision of public instruction at the state level. See Wis. Stat. § 115.001(2); see also Wis. Admin. Code PI (2013-14). The DPI is created by the Legislature and is "under the direction and supervision of the state superintendent of public instruction" Wis. Stat. § 15.37, and it is the agency that promulgates rules when it or the SPI are required to do so. For example, Wis. Stat. § 115.28(5) requires the SPI to promulgate rules establishing procedures for bringing appeals before the SPI, but the rule itself is drafted and promulgated by the DPI. See Wis. Admin. Code PI 1; CR 87-84, 384B Wis. Admin. Reg. (Dec. 31, 1987). The SPI is the "individual or body with policy making powers" who must approve rules proposed by the DPI.

 Wis. Stat. § 227.11(2)(a) (an agency may promulgate rules to effectuate the purpose of any statute administered by it); see also, e.g., Wis. Stat. § 85.16 (giving the Secretary of Transportation the authority to make rules "deemed necessary to the discharge of the powers, duties and functions vested in the department [of transportation]").
The Legislature also frequently requires an agency to promulgate a rule on a certain subject. See generally Wis. Stat. § 41.11(lg)(b)(5) (requiring the Department of Tourism to "establish by rule" a reporting and verification requirement for recipients of grants or loans under state economic development programs); Wis. Stat. § 118.045 (requiring the Department of Public Instruction to promulgate rules to implement and administer the statute section regarding commencement of the school term); Wis. Stat. § 150.03 (requiring the Department of Health Services to adopt rules and set standards to administer subchapters I and II of Wis. Stat. ch. 150).

 See Ralph M. Hoyt, The Wisconsin Administrative Procedure Act, 1944 Wis. L. Rev. 214 (1944).

 The statute gives a long list of agency actions or inac-tions that are not considered rules even though they would otherwise fit the definition given, such as actions concerning the internal management of an agency that do not affect private rights or interests, decisions or orders in contested cases, actions which relate to military or naval affairs, etc. See Wis. Stat. § 227.01(13)(a)-(zz).

 Agencies generally cannot take any legally binding action pursuant to a statute without promulgating a rule. For example, the COP-W/CIP-II program allows individuals who would qualify for Medicaid institutional care to instead receive services at home. The Department of Health and Family Services (DHFS) (now Department of Health Services) is *463 tasked with administering this statute. Wis. Stat. § 49.43(3e), .45(1). Wis. Stat. § 49.45(6m)(i) states that this benefit is only available for persons receiving skilled, intermediate, or limited levels of nursing care as defined by the DHFS. In 2005, DHFS gave a written instruction to county "screeners" that changed how the screeners assessed whether someone qualified for "limited" care, but did not promulgate a rule to implement the new definition of needing limited care. Cholvin v. DHFS, 2008 WI App 127, ¶ 13, 313 Wis. 2d 749, 758 N.W.2d 118. Previously, screeners were to assess people based upon their needs on a "bad day." Id., ¶ 19. The new instruction required screeners to assess a person as fully functional unless they needed assistance one-third of the time or more. Id. The court of appeals determined that the instruction was invalid and had to be promulgated as a rule. The court found that the instruction "interprets law because it removes from consideration a number of possible functional limitations" and that it created a new standard because it imposed "an entirely new eligibility condition established by DHFS." Id., ¶¶ 32-33. Thus, pursuant to Wis. Stat. § 227.10(1) and ,10(2m), DHFS screeners could not use the instruction to determine whether someone qualified for limited care until it validly promulgated the instruction as a rule.

 "Each agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute." Wis. Stat. § 227.10(1).

 Again, we do not endeavor to recite every step of the process in detail, and there are many more requirements that must be met for a rule to be properly promulgated. See Wis. Stat. ch. 227 sub. II.

 The legislative review process is elaborate and complicated, and again we are merely giving a summary and not a comprehensive analysis of the process. The full legislative review process can be found in Wis. Stat. §§ 227.19-.265.

 As noted previously, in some circumstances Wis. Stat. § 227.137(6) as amended by Act 21 also allows the Secretary of Administration to keep a draft rule from being reviewed by the Legislature.

 Stated otherwise, the analysis changes depending on the right at issue. For example, when the challenge to the application of the statute involves an issue of freedom of conscience based on religious beliefs, we apply the "compelling state interest/least restrictive alternative test." See Tammy W-G v. Jacob T., 2011 WI 30, ¶ 50, 333 Wis. 2d 273, 797 N.W.2d 854.

 "Unlike the federal courts, which can only hear 'cases' or 'controversies,' standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy." McConkey v. Van Hollen, 2010 WI 57, ¶ 15, 326 Wis. 2d 1, 783 N.W.2d 855. Accordingly, we are not required to reexamine this issue before proceeding.

 "Public instruction" has been interpreted as "the elementary and high schools supported by pubic taxation." Wis. Stat. § 115.01(1). The SPI is tasked with the supervision of the public schools grades K-12, and the supervision of programs for the public schools that are supported by public taxation. See, e.g., Wis. 115.28 (1), (3), (20)-(23).

 See Wis. Stat. chs. 115-121; see also Part D., infra; n.35, infra.

 "The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July." Wis. Const. Art. X, sec. 1.

 Superintendent, Noah Webster, An American Dictionary of the English Language, 810 (J.E. Worcester ed., New York, N. & J. White, 15th abr. ed. 1838).

 This does not mean that the SPI must have direct control over every decision made by the other officers of supervision of public instruction. See, e.g., Wis. Stat. § 118.01(1) (outlining the responsibilities of the superintendent, the school boards, the parents and guardians of pupils, and the state in public education). Rather, the SPI has the "power of direction" of the other officers of supervision of public instruction if those officers are not free to ignore the directives of the SPI made pursuant to the statutes he is tasked with administering by the Legislature. Compare Wis. Stat. ch. 115 with Wis. Stat. ch. 118.

 The term "supervision" was not changed by the 1902 amendment, so we use a dictionary from around the time Article X, § 1 was initially adopted. Additionally, the definition has not changed substantially since 1848. "Supervision" is defined as " [t]he series of acts involved in managing, directing, or overseeing persons or projects"; Supervision, Black's Law Dictionary (10th ed. 2014).

 Supervision, Noah Webster, An American Dictionary of the English Language, 811 (J.E. Worcester ed., New York, N. & J. White, 15th abr. ed. 1838).

 The laws of 1848 did not provide separate numbers for each act. Thus, we will cite to these laws by the page on which it appears in the bound volume of the Laws and the section number where appropriate.

 Some record-keeping responsibilities were given to the town clerk. See Laws of 1848, 226 — 47, Sec.80 — 88.

 For a summary of the various ways the Legislature organized the school system between 1848 and 1924, see Patzer, Public Education in Wisconsin (1924).

 There were some instances where the Mayor of a city was designated as one of the members of the city board of education; however, the vesting of supervision was in the board, not in the mayor. See, e.g., Laws of 1865, Chapter 268, 361-362 (Appleton city board of education to consist of the mayor, the director, and the clerk of each school district, with the city superintendent as an ex officio member).

 See Raymer v. Cunningham, 82 Wis. 39, 48, 51 N.W. 1133 (1892) ("[Article X, § 1] expressly declares that 'the supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct. This left the legislature free to prescribe such assistants and clerks as may be deemed essential." (emphasis added)); Thompson v. Craney, 199 Wis. 2d 674, 707, 546 N.W.2d 123 (1996) (Wilcox, J., concurring) ("The ability of the legislature to create other state officers who exercise supervisory authority over public instruction was addressed by this court in Burton v. State Appeal Bd. . . . [and the court held the board members were Article X officers rather than mere "employees"]." (emphasis added)); Fortney v. Sch. Dist. of W. Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982) ("Because the constitution explicitly authorized the legislature to set the powers and duties of the public instruction officers, Article X, § 1 confers no more authority upon those officers than that delineated by statute." (emphasis added)).

 Within Wis. Stat. chs. 115-121, there are 53 instances where the statutes state that the SPI or the DPI "shall" promulgate rules, and 18 instances where the statutes state that a particular item will be administered "as defined [by the SPI or DPI] by rule." This does not include statutes that the SPI or DPI would have to promulgate a rule to administer or enforce due to the requirements of Wis. Stat. § 227.10.

 See, e.g., Wis. Stat. § 115.28(7) (SPI must make rules establishing standards and procedures for licensing teachers); Wis. Stat. § 115.28(59)(d) (SPI must promulgate rules to provide academic and career planning to students); Wis. Stat. § 115.36(3)(a) (Department of Public Instruction must promulgate rules to fund school district projects assisting minors with drug or alcohol problems); Wis. Stat. § 115.415 (Department of Public Instruction must promulgate rules on evaluating teacher effectiveness); Wis. Stat. § 118.045(3) (Department of Public Instruction shall promulgate rules to determine whether a school board may commence the term before September 1); Wis. Stat. § 120.14 (Department of Public Instruction must establish by rule a standard contract and minimum standards for school board audits).

 Wisconsin Stat. § 227.185.

 This statement assumes that the Legislature continues to require the SPI and DPI to promulgate rules.

 See Wis. Stat. § 115.28(7); Wis. Stat. § 115.343(1); Wis. Stat. § 118.51(5)(d)3.

 The closest Chief Justice Roggensack's dissent comes to answering this question is its statement that" [t]he legislature has broad constitutional power over the Superintendent, so long as the tasks assigned do not fall outside public instruction, as it was alleged the statute did in School Dist. No. 3, supra." Chief Justice Roggensack's dissent, ¶ 225 (emphasis added). Thus, the dissent comments that the tasks assigned to the SPI must relate to public instruction. But it fails to consider whether the people to whom the tasks are assigned — the officers — must relate to public instruction. We are confident that had Chief Justice Roggensack undertaken her constitutional analysis with regard to the issue presented, she would have reached the same conclusion we reach.