# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP2278-OA |
| COMPLETE TITLE: | Kristi Koschkee, Amy Rosno, Christopher Martinson and Mary Carney, |
| |         Petitioners, |
| |     v. |
| | Carolyn Stanford Taylor, in her official capacity as Wisconsin Superintendent of Public Instruction and Wisconsin Department of Public Instruction, |
| |         Respondents. |

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | June 25, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 10, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | R.G. BRADLEY, J., concurs (opinion filed). KELLY, J., concurs (opinion filed). |
|   DISSENTED: | A.W. BRADLEY, J., dissents, joined by DALLET, J., (opinion filed). |
|   NOT PARTICIPATING: | ABRAHAMSON, J., withdrew from participation. |

ATTORNEYS:

For the petitioners, there were briefs filed by *Richard M. Esenberg*, *Brian McGrath*, *CJ Szafir*, and *Wisconsin Institute For Law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg*.

For the respondents, there was a brief filed by *Ryan Nilsestuen*, *Benjamin R. Jones*, and *Wisconsin Department of Public Instruction*, Madison. There was an oral argument by *Lester A. Pines* and *Pines Bach LLP*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Association of School Boards, Inc., and the Wisconsin School Administrators' Alliance, Inc., by *Michael J. Julka*, *Richard F. Verstegen*, *M. Tess O'Brien-Heinzen*, and *Wisconsin Association of School Boards, Inc. and School Administrators' Alliance, Inc.*, Madison. There was an oral argument by *Richard F. Verstegen*.

An amicus curiae brief was filed on behalf of Peggy Coyne, Mary Bell, Mark W. Taylor, Corey Otis, Marie Stangel, Jane Weidner, and Kristin A. Voss, by *Lester A. Pines* and *Pines Bach LLP*, Madison. With whom on the brief was *Christina M. Ripley* and *Wisconsin Education Association Council*, Madison. There was an oral argument by *Jeffrey A. Mandell* and *Stafford Rosenbaum LLP*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2017AP2278-OA

STATE OF WISCONSIN                    :        IN SUPREME COURT

**Kristi Koschkee, Amy Rosno, Christopher Martinson and Mary Carney,**

       **Petitioners,**

  **v.**

**Carolyn Stanford Taylor, in her official capacity as Wisconsin Superintendent of Public Instruction and Wisconsin Department of Public Instruction,**

       **Respondents.**

**FILED**

**JUN 25, 2019**

Sheila T. Reiff
Clerk of Supreme Court

ORIGINAL ACTION for declaratory judgment.  *Declaration of rights; relief granted.*

¶1   PATIENCE DRAKE ROGGENSACK, C.J.   This is an original action brought by Kristi Koschkee et al., two licensed teachers and two school board members, against Superintendent of Public Instruction (SPI) Carolyn Stanford Taylor and the Department of Public Instruction (DPI).   The petitioners argue that the SPI and DPI must comply with the statutory requirement that, prior to drafting or promulgating an administrative rule, they must

receive written approval from the governor.[1] The SPI and DPI argue that this requirement of gubernatorial approval is unconstitutional as applied to the SPI because, pursuant to Article X, Section 1 of the Wisconsin Constitution, no other officer may be placed in a position equal or superior to that of the SPI with regard to the "supervision of public instruction."

¶2 We conclude that the gubernatorial approval requirement for rulemaking is constitutional as applied to the SPI and DPI, whether such approval authority is found in 2017 Wis. Act 57 or in previous provisions of ch. 227. Article X, Section 1 vests supervision of public instruction, an executive function, in the SPI. In contrast, when the SPI, through the DPI, promulgates rules, it is exercising legislative power that comes not from the constitution but from the legislature. Stated otherwise, the legislature delegates part of its constitutional power to legislate to the SPI, DPI, and many other agencies in the form of rulemaking power. That the SPI also has the executive constitutional function to supervise

---

[1] The legislature imposed this requirement on all administrative agencies in 2011 with the passage of 2011 Wis. Act 21. The petitioners initially argued that they sought to force the SPI and DPI to comply with the Regulations from the Executive in Need of Scrutiny Act, 2017 Wis. Act 57 (REINS Act) which introduced the requirements that (1) agencies submit scope statements to the Department of Administration (DOA), and (2) hold a public comment and hearing period on proposed rules. The petitioners later conceded that the SPI and DPI complied with these two requirements, and that their challenge was based on the constitutionality of the gubernatorial approval requirement as applied to the SPI and DPI.

public instruction does not transform the SPI's legislatively delegated rulemaking power into a constitutional supervisory function. Therefore, it is of no constitutional concern that the governor is given equal or greater legislative authority than the SPI in rulemaking.

I. BACKGROUND

¶3 2011 Wis. Act 21 (Act 21) amended sections of Wis. Stat. ch. 227 (2009-10), the Wisconsin Administrative Procedure Act. Prior to the passage of Act 21, an agency[2] planning to draft an administrative rule submitted a "statement of scope" to the Legislative Reference Bureau (LRB) for publication, and to the "individual or body with policy-making powers over the subject matter of a proposed rule" for approval. Wis. Stat. § 227.135(2) (2009-10). A scope statement describes the rule and its objectives, the statutory authority for promulgating the rule, the time and resources required to develop the rule, the entities affected, and a summary of relevant federal regulations. Wis. Stat. § 227.135(1)(a)-(f) (2017-18).[3] After submitting the scope statement, the agency drafted the proposed

---

[2] "Agency" is defined broadly. An agency is "a board, commission, committee, department or officer in the state government, except the governor, a district attorney or a military or judicial officer." Wis. Stat. § 227.01(1). The SPI meets this description, and is therefore also considered an "agency" within the meaning of ch. 227.

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

3

rule and submitted it to the legislature for review.  Wis. Stat. §§ 227.135-.19 (2009-10).

¶4  Act 21 altered this procedure.  Act 21 required an agency first to submit its scope statement to the governor for approval; agencies were prohibited from submitting a scope statement to the LRB until the governor issued a written notice of approval.  An agency could not "perform any activity in connection with the drafting of a proposed rule . . . until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve[d]."  Wis. Stat. § 227.135(2).  Additionally, rather than submitting final drafts of proposed rules directly to the legislature for approval, agencies were required first to submit final drafts of proposed rules to the governor for approval.  Wis. Stat. § 227.185.  The proposed rule could not be submitted to the legislature for approval unless and until the governor again approved the rule in writing.  Id.

¶5  We reviewed these gubernatorial approval requirements in Coyne v. Walker, 2016 WI 38, ¶6, 368 Wis. 2d 444, 879 N.W.2d 520, and decided that they were "void as applied to the [SPI] and his subordinates."  Id., ¶4.  There was no majority opinion in Coyne.  Our mandate resulted from a one-justice lead opinion, a two-justice concurrence, and a one-justice concurrence, all of which agreed only on the outcome of the case.

¶6  In 2017, the Wisconsin legislature passed the Regulations from the Executive in Need of Scrutiny Act, 2017 Wis. Act 57 (REINS Act).  The REINS Act added the requirement

4

that agencies submit scope statements to the Department of Administration (DOA), which determines whether the agency has authority to promulgate the rule. REINS Act, § 3. The DOA also makes a non-binding recommendation to the governor. REINS Act, § 3. The REINS Act required agencies to hold a preliminary public hearing and comment period on the scope statement at the request of a co-chairperson of the Joint Committee on Review of Administrative Rules (JCROR). REINS Act, § 5.

¶7 The REINS Act did not alter Act 21's requirement that an agency (1) submit a statement of scope to the governor for approval prior to drafting a proposed rule, and (2) submit a final draft of a rule to the governor for approval before submitting it to the legislature.

¶8 The petitioners conceded at oral argument that the SPI and DPI had submitted scope statements to the DOA and held preliminary public hearings and comment periods upon request. However, the petitioners assert that the REINS Act "variously amends and reenacts parts of a comprehensive statutory scheme" and that their challenge therefore encompasses the "full suite of requirements" of ch. 227.[4] The petitioners ask us to overrule Coyne's mandate and hold that the SPI and DPI must comply with the "full suite of requirements" of ch. 227, including the requirement for written gubernatorial approval both before drafting a proposed rule and before submitting a final draft of

---

[4] Petitioner's Reply Br. at 3.

5

a proposed rule to the legislature. We accepted the petition for original action, and now conclude that the requirement that agencies receive gubernatorial approval prior to drafting a proposed rule and again before submitting it to the legislature for approval is constitutional as applied to the SPI and DPI. Accordingly, we overrule our prior decision in Coyne v. Walker, 368 Wis. 2d 444.[5]

---

[5] Because our decision in Coyne v. Walker, 2016 WI 38, 368 Wis. 2d 444, 879 N.W.2d 520 addressed some of the same statutory provisions and constitutional concerns we examine today, we consider whether the doctrine of stare decisis should be employed in the case before us. Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶41, 281 Wis. 2d 300, 697 N.W.2d 417.

Stare decisis is a principle of policy that can add certainty to the law. State v. Denny, 2017 WI 17, ¶71, 373 Wis. 2d 390, 891 N.W.2d 144. However, stare decisis does not require us to retain constitutional interpretations that were objectively wrong when made. See Wenke v. Gehl Co., 2004 WI 103, ¶21, 274 Wis. 2d 220, 682 N.W.2d 405. This is so because such interpretations are unsound in principle. State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592 (citations omitted).

Furthermore, our mandate in Coyne arises from a lead opinion, joined by one justice, a two-justice concurrence, and a one-justice concurrence. When we are asked to overturn one of our prior decisions, lead opinions that have no common legal rationale with their concurrences are troublesome. For example, we cannot analyze whether "[c]hanges or developments in the law have undermined the rationale behind a decision," Luedtke, 362 Wis. 2d 1, ¶40, if there is no "rationale" to analyze. We are in such a circumstance in the matter now before us. Accordingly, for the reasons set forth below, we conclude that an independent analysis of the issues presented herein better serves the interests of the public.

## II. DISCUSSION

### A. Standard of Review

¶9 We are required to interpret Article X, Section 1 in order to decide the pending controversy. Interpretations of provisions of the Wisconsin Constitution present legal questions. Custodian of Records for the LTSB v. State, 2004 WI 65, ¶6, 272 Wis. 2d 208, 680 N.W.2d 792. This case also requires us to apply a statute. The interpretation and application of a statute to a given set of facts present questions of law as well. Marder v. Bd. of Regents of Univ. Wis. Sys., 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110.

### B. Rulemaking Authority

¶10 The Wisconsin Constitution establishes three separate branches of government, with "no branch subordinate to the other, no branch to arrogate to itself control over the other except as is provided by the constitution, and no branch to exercise the power committed by the constitution to another." State ex rel. Friedrich v. Dane Cty. Cir. Ct., 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995) (citation omitted). Legislative power is vested in a senate and assembly, executive power is vested in a governor, and judicial power is vested in a unified court system. Wis. Const. art. IV, V, VII.

¶11 "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them." Schuette v. Van De Hey, 205 Wis. 2d 475, 480-81, 556 N.W.2d 127 (1996). Powers constitutionally vested in the legislature include the powers: "'to declare whether or not there shall be

7

a law; to determine the general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate.'" See, e.g., Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (quoting State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 505 220 N.W. 929 (1928)).

¶12 A "rule" is "a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." Wis. Stat. § 227.01(13). Therefore, when administrative agencies promulgate rules, they are exercising legislative power that the legislature has chosen to delegate to them by statute. See id. at 505-06 (the legislature "may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose . . . . It [] leads to confusion and error to say that the power to fill up the details and promulgate rules and regulations is not legislative power."); Brown Cty. v. DHFS, 103 Wis. 2d 37, 43, 307 N.W.2d 247 (1981) ("Where the legislature has set forth the 'fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose.'") (citations omitted).

¶13 From time to time, the legislature has used its power to create administrative agencies, such as the Department of

8

Health Services and the Department of Financial Institutions, and to delegate to agencies certain legislative powers. The legislature created DPI in 1967. Wis. Stat. § 15.37 (1967).

¶14 Agencies are considered part of the executive branch. Citizens Concerned for Cranes and Doves v. DNR, 2004 WI 40, ¶14, 270 Wis. 2d 318, 677 N.W.2d 612. They possess "'only those powers [that] are expressly conferred or [that] are necessarily implied by the statutes under which [they] operate[].'" See, e.g., Kimberly-Clark Corp. v. Pub. Serv. Comm'n, 110 Wis. 2d 455, 461-62, 329 N.W.2d 143 (1983). The DPI is the administrative agency responsible for promulgating rules related to public instruction, and acts "under the direction and supervision of the [SPI]." Wis. Stat. § 15.37.

¶15 The powers delegated to administrative agencies by the legislature include the power to promulgate rules within the boundaries of enabling statutes passed by the legislature. See Wis. Stat. § 227.11(2)(a) ("Each agency may promulgate rules interpreting the provisions of any statute enforced or administered by the agency, if the agency considers it necessary to effectuate the purpose of the statute, but a rule is not valid if the rule exceeds the bounds of correct interpretation."); State ex rel. Castaneda v. Welch, 2007 WI 103, ¶26, 303 Wis. 2d 570, 735 N.W.2d 131.

¶16 In Wis. Stat. § 227.19(1)(b), the legislature explained that its delegation of legislative power is a recognition of "the need for efficient administration of public policy," and it also outlined reservations of that delegation.

9

Accordingly, in its general rulemaking delegation, the legislature "reserves to itself" all of the following:

1. The right to retract any delegation of rule-making authority.

2. The right to establish any aspect of general policy by legislation, notwithstanding any delegation of rule-making authority.

3. The right and responsibility to designate the method for rule promulgation, review and modification.

4. The right to delay or suspend the implementation of any rule or proposed rule while under review by the legislature.

§ 227.19 (1)(b)1.-4.

¶17 We have long recognized that "the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government." Gilbert v. Med. Examining Bd., 119 Wis. 2d 168, 184, 349 N.W.2d 68 (1984); see also Schmidt, 39 Wis. 2d at 58 ("[O]ur government could not efficiently operate without the administrator and administrative agency."). The administration of state government is complex. For example, "[t]he Wisconsin Administrative Code is more than 11,000 pages long with just under 1,800 chapters of regulations that affect businesses, local governments, licensed professionals, and consumers and touch[es] virtually every industry in Wisconsin." See, e.g., Jodi E. Jensen, Regulatory Reform: Moving Policymaking from State Agencies to the Legislature, 91 Wis. Law. 24, 25 (Oct. 2018).

¶18 However, while the breadth of government legislation has resulted in some delegation of legislative power to agencies, such agencies remain subordinate to the legislature with regard to their rulemaking authority. Stated otherwise, agencies "ha[ve] no inherent constitutional authority to make rules, and, furthermore, [their] rule-making powers can be repealed by the legislature." Martinez v. DILHR, 165 Wis. 2d 687, 698, 478 N.W.2d 582 (1992); Wis. Stat. § 227.19(1)(b)1.

¶19 In addition, the case before us does not present issues that should give rise to a dogmatic exposition on the merits, or lack thereof, of administrative agencies. Rather, we are asked to determine the extent to which the legislature can change a past delegation of rulemaking authority when the SPI's rulemaking is affected.

¶20 Legislative change and control of rulemaking are within the constitutional power of the legislature. Martinez, 165 Wis. 2d at 698. As we have explained, an agency's "'powers, duties and scope of authority are fixed and circumscribed by the legislature and subject to legislative change.'" Id. (quoting Schmidt, 39 Wis. 2d at 56). Because the legislature has the authority to take away an administrative agency's rulemaking authority completely, it follows that the legislature may place limitations and conditions on an agency's exercise of rulemaking authority, including establishing the procedures by which agencies may promulgate rules. The legislature may therefore retract or limit any delegation of rulemaking authority, determine the methods by which agencies must promulgate rules,

11

and review rules prior to implementation. Wis. Stat. § 227.19(1)(b)1.-4.; see, e.g., Wis. Realtors Ass'n v. Pub. Serv. Comm'n, 2015 WI 63, ¶23, 363 Wis. 2d 430, 867 N.W.2d 364.

¶21 After the enactment of Act 21, agencies must first submit scope statements to the governor for approval; agencies may not submit scope statements to the LRB, or begin drafting any proposed rule, "until the governor issues a written notice of approval of the statement." Wis. Stat. § 227.135(2). Additionally, rather than submit final drafts of proposed rules directly to the legislature for approval, agencies must first submit final drafts of proposed rules to the governor for approval. Wis. Stat. § 227.185. A proposed rule may not be submitted to the legislature without a second approval of the governor. § 227.185. Act 21 therefore altered the legislature's delegation of rulemaking power to agencies by allowing the governor to block a proposed rule at two separate stages of the rulemaking process.

C. SPI's Constitutional Authority

¶22 The constitutional genesis of the SPI is found in Article X, Section 1, which provides:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all

12

other officers of supervision of public instruction shall be fixed by law.

Wis. Const. art. X, § 1. Article X, Section 1 does not define the term "supervision."

¶23 When we interpret an undefined constitutional term we examine the common law as it existed at the time the constitutional provision was enacted, the constitutional debates that bore on the undefined term, the plain meaning of the term at the time the constitutional provision was adopted, and the earliest interpretation in laws passed shortly after adoption of the constitutional provision or our opinions that interpreted the provision. See Polk Cty. v. State Pub. Def., 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994) (citing State v. Beno, 116 Wis. 2d 122, 136-38, 341 N.W.2d 668 (1984)).

¶24 Our examination of the common law functions of the SPI at statehood provides no guidance, because an officer responsible for public education did not exist prior to 1848. Therefore, Article X, Section 1 did not "incorporate[] an ancient common law office, possessing defined powers and duties, into the constitution. Public instruction and its governance had no long-standing common law history at the time the Wisconsin Constitution was enacted." Fortney v. Sch. Dist. of West Salem, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982).

¶25 However, an examination of the plain language of Article X, Section 1, the Constitutional Conventions of 1846 and 1848, and early cases and statutes addressing the SPI's supervisory authority demonstrates that supervision is an

13

executive function. "Stated otherwise, the framers of the Constitution chose no specific duties for the [SPI] in regard to 'supervision of public instruction.'" Coyne, 368 Wis. 2d 444, ¶185 (Roggensack, C.J., dissenting). Rather, powers and duties of the SPI were prescribed by law. Id., ¶143 (Prosser, J. concurring).

¶26 Furthermore, the debates during the 1846[6] and 1848 constitutional conventions surrounding the creation of the SPI confirm this plain-meaning interpretation of "supervision" as executive authority. Delegate Marshall M. Strong, for example, thought the SPI should "travel over the state, organize the system, and awaken people to the importance of [public education]." Journal of the Convention, reprinted in The Convention of 1846, 569 (Milo M. Quaife, ed., 1919). Another delegate, Wallace W. Graham, thought "there could be no uniform system" of public education without an SPI, because the legislature needed to receive "an annual report of the state of schools throughout the state" from "a man whose entire business it is to visit and know all of the schools." Id. at 568. Others disagreed and thought "the duties for a time might be

---

[6] As we have explained previously, the constitution drafted in 1846 was not approved by Wisconsin voters. However, it was rejected for reasons other than the article on education, and the 1846 and 1848 versions of the article on education were substantially identical. See Thompson v. Craney, 199 Wis. 2d 674, 685 n.5, 546 N.W.2d 123 (1996). For this reason, the debates of 1846 are instructive in discerning the meaning of "supervision" as used in Article X.

14

done by the secretary of state or some other officer already provided for, leaving to the legislature to [create an SPI] when the time came." Id. at 569. None, however, appeared to believe that the SPI would possess the power to make laws.

¶27 The debates during the Constitutional Convention of 1848, which led to the ratification of the Wisconsin Constitution, similarly demonstrate that supervision of public education is an executive function. All writers reportedly "had agreed that the office [of the SPI] should have nothing to do with the machinery of the school system, or the management of the funds. He might be a most improper person for that duty. His province was to put the system in operation." Journal of the Convention to Form a Constitution for the State of Wisconsin 324, Wisconsin Constitutional Convention (Tenney, Smith & Holt, printers, 1848). Delegates recognized that "[t]he duties of a superintendent were not of a fixed and well known kind, like those of political officers." Id. at 327. As previously mentioned, neither the office of the SPI nor a uniform system of public instruction existed in Wisconsin prior to 1848. For this reason, some argued that even the manner of choosing the SPI should be left to the legislature to decide. No part of the discussion, however, involved the suggestion that the SPI should have the power to make laws.

¶28 The dictionary definition of "superintend" at the time of the debates further suggests that the framers viewed the SPI as possessing executive, but not legislative, authority. Webster's An American Dictionary of the English Language (new

15

rev. ed. 1847-50) defined "superintend" as: "[t]o have or exercise the charge or oversight of; to oversee with the power of direction; to take care of with authority; as an officer superintends the building of a ship or construction of a fort." Similarly, "superintendent" was defined as "one who has the oversight and charge of something with the power of direction." Id.; see Thompson v. Craney, 199 Wis. 2d 674, 684, 546 N.W.2d 123 (1996). The framers of the Wisconsin Constitution understood the SPI's superintending function to be executive, not legislative, in nature.

¶29 Our early cases regarding the SPI similarly confirm this plain-meaning analysis of Article X, Section 1 as granting the SPI the executive superintending function over public instruction, while giving the legislature the authority to determine the SPI's "qualifications, powers, duties and compensation." For example, in State ex rel. Raymer v. Cunningham, 82 Wis. 39, 51 N.W.2d 1133 (1892), the SPI directed the Secretary of State to pay him more than his $1,200 salary, plus the expenses actually incurred for his clerk's salary and actual travel costs. Id. at 39-40. However, in 1892, the Wisconsin Constitution provided that the SPI's "compensation shall not exceed the sum of twelve hundred dollars annually." Id. at 46.

¶30 Wisconsin's public education system had grown considerably since the ratification of the Constitution in 1848. For example, the number of school age children had grown from 80,000 to more than 600,000, the value of public school property

16

had grown from $50,000 to more than $10 million, and tax distributions for public education had grown from $92,000 to more than $4 million. Id. Raymer argued that the SPI had requested payment for greater expenses than he actually incurred as a way of evading the maximum constitutional salary of $1,200. Id. at 47-48.

¶31 In our examination of the relationship between the legislature and Article X, Section 1, we said:

> [T]he section of the constitution cited prohibited the legislature from increasing the compensation of that officer beyond the amount named, yet it expressly authorized them to increase his duties and enlarge his powers and responsibilities ad libitum. This authority of the legislature has been from time to time freely exercised by especially enjoining new duties and imposing new and more onerous responsibilities.

Id. at 47. We concluded that even though the constitution allowed the SPI a maximum salary of $1,200, the legislature remained free to define the SPI's activities and obligations however it chose. It was the legislature's province to make laws, and the SPI's province to administer them. See id. at 50 ("[I]t is a maxim, in construing a state constitution, that the legislature is authorized to exercise any and all legislative powers not delegated to the general government nor expressly nor by necessary implication prohibited by the national or state constitution.").

¶32 Similarly, after the Wisconsin Constitution was ratified in 1848, the first legislation passed regarding Article X, Section 1 provided:

17

> The superintendent shall have a general supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education . . . . To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state: . . . To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district: [] to ascertain the condition of all the school funds in this state with the amount of the school funds due to each township from lands or other sources: . . . to adjust and decide all controversies and disputes arising under the school lands without costs to the parties: [] to perform such other duties as the legislature or governor of this state may direct.

Thompson, 199 Wis. 2d at 694 (quoting Section 3 of the Laws of 1848, at 127-29). The specific instructions that the legislature gave to the SPI, such as his obligation to recommend "the most approved books" and to "ascertain the condition of all the school funds in this state" as well as a general directive that the SPI was "to perform such other duties as the legislature or governor of this state may direct" support the conclusion that the legislature defines the SPI's powers and duties, while the SPI administers them.

### D. Application

¶33 Agencies in Wisconsin have no inherent authority to make rules. Their rulemaking authority comes from the legislature, and may be limited, conditioned, or taken away by the legislature. See, e.g., Martinez, 165 Wis. 2d at 697; Wis. Stat. § 227.19(1)(b)1.-4.

¶34 The Wisconsin Constitution vests "supervision of public instruction," which is an executive function, in the SPI.

18

However, the SPI's powers and duties are set by the legislature. The SPI therefore has two different sources for its authority, one which arises from the Wisconsin Constitution and the other which is created by legislative delegation. The source for rulemaking is legislative delegation. Because rulemaking is not "supervision of public instruction" within the meaning of Article X, Section 1, it is of no constitutional concern whether the governor is given equal or greater legislative authority than the SPI in rulemaking.

¶35 This conclusion is consistent with our decision in Thompson, where we reviewed then-governor Thompson's original action to have 1995 Wis. Act 27 (Act 27) declared constitutional. Thompson, 199 Wis. 2d at 677-78. Act 27 "created a new state department, the Department of Education; a new Education Commission, which supervises the DOE; and a new office, the Secretary of Education." Id. at 678. The SPI was one of nine voting members of the Education Commission. Id. at 679. The Secretary of Education served at the pleasure of the governor and could not be removed by the Education Commission. Id. at 678. The newly created Secretary of Education and Education Commission were given some of the SPI's constitutional functions to supervise education. Id. at 679.

¶36 We held that Act 27 violated Article X, Section 1. We identified two "consistent themes" regarding the SPI from the constitutional debates: "first, that the system of education required uniformity; second, that the SPI was to provide this uniformity in an active manner by implementing the system of

19

education." Id. at 688-89. We concluded that "the 'other officers' mentioned in [Article X, Section 1] were intended to be subordinate to the [SPI]" with regard to the "supervision of public instruction" as the phrase is used in Article X, Section 1. Id. at 698-99. Because Act 27 elevated others to a position equal or superior to the SPI with regard to the supervision of public instruction, it was unconstitutional. Id. at 698-99.

¶37 The respondents argue that the provisions in this case are similarly unconstitutional because they elevate the governor to a position greater or equal to the SPI with regard to something the SPI does, as did 1995 Wis. Act 27. The respondents point out that we held in Thompson that "the legislature may not give equal or superior authority to any 'other officer'" over the supervision of public instruction. Id. at 699. Article X, Section 1 requires that any "other officer" who participates in the "supervision of public instruction" must be subordinate to the SPI with regard to supervision of public instruction. Id.

¶38 A major flaw in the respondents' argument is the assumption that everything the SPI does arises from a constitutional grant of authority to the SPI under Article X, Section 1. In reality, the SPI engages in some activities that arise from legislative enactments. Rulemaking is one of those activities.

¶39 Although Thompson requires that no other officer be placed in a position superior or equal to the SPI with regard to the SPI's exercise of supervision of public instruction under

20

Article X, Section 1, rulemaking is not such a function. Rulemaking is a legislative power that does not fall within the SPI's supervisory constitutional authority under Article X, Section 1. Rulemaking is a legislative delegation to the SPI; therefore, it may be limited or taken away, as the legislature chooses. Wis. Stat. § 227.19(1)(b)1.-4. That the governor may be placed in a position superior or equal to the SPI with regard to rulemaking is consistent with Thompson and with Article X, Section 1.

### III. CONCLUSION

¶40 We conclude that the gubernatorial approval requirement for rulemaking is constitutional as applied to the SPI and DPI, whether they are found in the REINS Act or in previous provisions of ch. 227. Article X, Section 1 vests supervision of public instruction, an executive function, in the SPI. In contrast, when the SPI, through the DPI, promulgates rules, the SPI is exercising legislative power that comes not from the constitution but the legislature. Stated otherwise, the legislature delegates part of its constitutional power to legislate to the SPI, DPI, and many other agencies in the form of rulemaking power. That the SPI also has the executive constitutional function to supervise public instruction does not transform the SPI's legislatively delegated rulemaking power into a constitutional supervisory function. Therefore, it is of no constitutional concern that the governor is given equal or greater legislative authority than the SPI in rulemaking.

*By the Court.*—Declaration of rights; relief granted.

21

¶41 SHIRLEY S. ABRAHAMSON, J., withdrew from participation.

¶42 REBECCA GRASSL BRADLEY, J. *(concurring)*. The majority correctly upholds the constitutionality of the legislature's decision to require gubernatorial approval of administrative rulemaking. I join the opinion except for those portions espousing the ostensible importance and necessity of the legislature's delegation of power to the administrative state. See majority op., ¶17.[1] The concentration of power within an administrative leviathan clashes with the constitutional allocation of power among the elected and accountable branches of government at the expense of individual liberty. Although this case does not involve a challenge to the constitutionality of legislative delegations of power to administrative agencies, I encourage the court to be mindful of the structural separation of powers and the safeguards it employs to preserve the rule of law.

¶43 The majority repeats the judiciary's longstanding perception that "the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government." Majority op., ¶17 (quoting Gilbert v. Medical Examining Bd., 119 Wis. 2d 168, 184, 349 N.W.2d 68 (1984) (emphasis added)). The majority reiterates the notion that "[o]ur government could not efficiently operate

---

[1] I agree with the majority that the issues in this case do not require an "exposition"——"dogmatic" or otherwise——of the constitutional legitimacy of the administrative state. Majority op., ¶19. I write in response to the majority's endorsement of the necessity of delegating legislative power to administrative agencies. See majority op., ¶17.

1

without the administrator and administrative agency." Majority op., ¶17 (quoting Schmidt v. Department of Res. Dev., 39 Wis. 2d 46, 58, 158 N.W.2d 306 (1968) (emphasis added)). The majority restates discredited principles, disregarding the incompatibility of "the system of bureaucratic rule that took root in the Progressive era and now reaches into virtually every realm of American life,"[2] with the constitution's "deliberate calibration of incentives and control between the branches" reflected in the structural separation of powers. Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶7, 376 Wis. 2d 147, 897 N.W.2d 384.

¶44 The idea that the administrative state is necessary for good and efficient government "reflect[s] this belief that bureaucrats might more effectively govern the country than the American people" and facilitated "the progressives usher[ing] in significant expansions of the administrative state, ultimately culminating in the New Deal." Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1223 n.6 (2015) (Thomas, J., concurring). Underlying the movement toward a burgeoning administrative state was the governing class's sneering contempt for the people who elect its members, along with impatience at any resistance of the people to the views of the enlightened:

> In government . . . the hardest of hard things is to make progress. . . . Nowadays the reason is that the many, the people, who are sovereign have no single ear which one can approach, and are selfish, ignorant,

---

[2] Charles J. Cooper, Confronting the Administrative State, 25 National Affairs 96, 96 (Fall 2015).

> timid, stubborn, or foolish with the selfishnesses,
> the ignorances, the stubbornnesses, the timidities, or
> the follies of several thousand persons,——albeit there
> are hundreds who are wise.

Woodrow Wilson, The Study of Administration, Political Science Quarterly, Vol. 2, No. 2, 197, 207-08 (June 1887). Wilson lamented the inability of the unwashed masses to appreciate the suppositions of "perfectly instructed heads" who would produce "infallible, placidly wise maxims of government" because "[t]he bulk of mankind is rigidly unphilosophical, and nowadays [alas!] the bulk of mankind votes." Id. at 209.

¶45 The philosophical roots of rule by bureaucratic overlords are antithetical to the Founders' vision of our constitutional Republic, in which supreme power is held by the people through their elected representatives, and "the creation of rules of private conduct" is "an irregular and infrequent occurrence." DOT v. Association of Am. R.Rs., 135 S. Ct. 1225, 1252 (2015) (Thomas, J., concurring). The people can keep their rightful powers only if each branch of government "jealously guard[s]" the responsibilities the people conferred upon them. Gabler, 376 Wis. 2d 147, ¶31 (quoting Barland v. Eau Claire Cty., 216 Wis. 2d 560, 573, 575 N.W.2d 691 (1998)). "The co-ordinate branches of the government . . . should not abdicate or permit others to infringe upon such powers as are exclusively committed to them by the Constitution." Rules of Court Case, 204 Wis. 501, 514, 236 N.W. 717 (1931). Transferring to administrative agencies the core legislative duty of making laws abnegates powers the people gave their elected representatives. The consolidation of power within executive branch agencies

3

"often leaves Americans at the[ir] mercy" endowing agencies with "a nearly freestanding coercive power" and "[t]he agencies thereby become rulers of a sort unfamiliar in a republic, and the people must jump at their commands." Phillip Hamburger, Is Administrative Law Unlawful? 335 (2014).

¶46 More recently, "necessity" as a justification for the administrative state has been tied to the philosophy of a living constitution, under which the law may be molded to reflect changing circumstances in society, regardless of what the text actually says. Hamburger, supra ¶4, at 429. Living constitutionalism is grounded in sociology, not the law,[3] and is inconsistent with the founding principle that "[t]o adapt the law to changing circumstances . . . the collective wisdom of the people's representatives is needed." Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring). Those to whom the people have conferred constitutional powers may not circumvent those grants simply "because they believe that more or different power is necessary." A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529 (1935). Necessity "cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained." Id. at 530. Even "[e]xtraordinary conditions do not create or enlarge constitutional power." Id. at 528.

---

[3] Phillip Hamburger, Is Administrative Law Unlawful? 429 (2014).

4

¶47 The United States and Wisconsin Constitutions both vest exclusive powers in each of three independent branches of government, not four. "The Constitution does not vest the Federal Government with an undifferentiated 'governmental power,'" but rather, it "identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government." Association of Am. R.Rs., 135 S. Ct. at 1240 (Thomas, J., concurring). Like the federal system, the Wisconsin Constitution establishes three branches of government, and "[t]he separation of powers doctrine is implicit in this tripartite division." Gabler, 376 Wis. 2d 147, ¶11 (quoting Panzer v. Doyle, 2004 WI 52, ¶48, 271 Wis. 2d 295, 680 N.W.2d 666; alteration in original). Article IV, Section 1 "vest[s]" the "legislative power . . . in a senate and assembly"; Article V, Section 1 "vest[s]" the "executive power . . . in a governor"; and Article VII, Section 2 "vest[s]" the "judicial power of this state . . . in a unified court system." See Gabler, 376 Wis. 2d 147, ¶11. These constitutional "grants are exclusive," which has been understood to mean "only the vested recipient of that power can perform it." Association of Am. R.Rs., 135 S. Ct. at 1241 (Thomas, J., concurring).

¶48 "The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws." Gabler, 376 Wis. 2d 147, ¶60. "The separation of powers 'operates in a general way to confine legislative powers to the legislature.'" League of Women Voters of Wis. v. Evers,

5

2019 WI __, ¶35, __ Wis. 2d __, __ N.W.2d __ (quoting Goodland v. Zimmerman, 243 Wis. 459, 467, 10 N.W.2d 180 (1943)). Applying an originalist interpretation of the Constitution, some United States Supreme Court justices and several commentators have opined against the legislature relinquishing its vested legislative power "or otherwise reallocat[ing] it," echoing the historical understanding that "[t]he legislative c[ould not] transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it [could not] pass it over to others." Association of Am. R.Rs., 135 S. Ct. at 1243-44 (Thomas, J., concurring) (quoting John Locke, Second Treatise of Civil Government § 141, 71 (J. Gough ed. 1947) (emphasis added; alterations in original). See also Richard A. Epstein, Why the Modern Administrative State Is Inconsistent with the Rule of Law, 3 N.Y.U.J. of Law & Liberty 491, 496 (2008) (the argument "that the Constitution authorizes the creation of independent agencies with aggregated powers of a legislative, executive, and judicial nature . . . fails so long as it depends on any form of originalism" and "the text itself points to a system whereby the tripartite division is meant to be rigid in law"); Hamburger, supra ¶4, at 336 ("[T]he government can bind Americans only through laws, and only through courts with juries and judges, thus preserving the most basic conditions of freedom.")

¶49 Although a revival of the non-delegation doctrine has not garnered the votes of a majority on the Court, this was not always the case. In the past, the Court recognized "[t]he

6

Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." A.L.A. Schechter Poultry Corp, 295 U.S. at 529. Despite acknowledging that the constitutional "text permits no delegation of those [legislative] powers" the Court has afforded much leeway for the legislature to transfer its constitutional powers to executive branch agencies, provided that "when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 472 (2001) (alteration in original). However, "the Constitution does not speak of 'intelligible principles.' Rather, it speaks in much simpler terms: 'All legislative Powers herein granted shall be vested in a Congress.'" Id. at 487 (Thomas, J., concurring).

¶50 Reallocating the making of rules, voluminous in number and significant in substance, from the legislature to administrative agencies housed within the executive branch, aggrandizes the power of the latter, at the risk of replacing the rule of law with the rule of men:

> The idea that the Executive may not formulate generally applicable rules of private conduct . . . has ancient roots in the concept of the 'rule of law,' which has been understood . . . to mean that a ruler must be subject to the law in exercising his power and may not govern by will alone.

Association of Am. R.Rs., 135 S. Ct. at 1242 (Thomas, J., concurring) (quoted source omitted). The concept of the rule of

7

law "presupposes at least two distinct operations, the making of law, and putting it into effect." Id. (quoted source omitted; emphasis added). Delegating legislative functions to administrative agencies transforms the executive from the executor of laws into the lawmaker. Blackstone——whose separation of powers principles "profoundly influenced" the Founders——"defined a tyrannical government as one in which 'the right both of making and of enforcing the laws, is vested in one and the same man, or one and the same body of men,' for 'wherever these two powers are united together, there can be no public liberty.'" Id. at 1244 (quoted source omitted).

¶51 The Founders recognized that maintaining the formal separation of powers was essential to preserving individual liberty.

> This devotion to the separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it. The Framers were concerned not just with the starting allocation, but with the "gradual concentration of the several powers in the same department." The Federalist No. 51, at 321 (J. Madison).

Id.. "Under the original understanding of the Constitution," the function of creating "generally applicable rules of private conduct . . . requires the exercise of legislative power," and "the discretion inherent in executive power does not comprehend the discretion to formulate generally applicable rules of private conduct." Id. at 1242. The judiciary, however, has blurred the lines distinguishing legislative power from executive power, classifying rulemaking as executive in nature

8

rather than the core legislative function it was formerly recognized to be. See id. at 1246.

¶52 The Wisconsin Constitution replicates the "separation of powers principles[] established at the founding of our nation and enshrined in the structure of the United States Constitution." See Gabler, 376 Wis. 2d 147, ¶11. "'Each branch has exclusive core constitutional powers into which other branches may not intrude.'" Id., ¶30 (quoting State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999)). These zones "are to be jealously guarded by each branch of government." Gabler, 376 Wis. 2d 147, ¶31 (quoting Barland, 216 Wis. 2d at 573) (internal marks omitted).

¶53 The concept of the administrative state is nonexistent in either the United States or Wisconsin Constitutions, which means "administrative power runs outside the law." Hamburger, supra ¶4, at 6.

> We have too long abrogated our duty to enforce the separation of powers required by our Constitution. We have overseen and sanctioned the growth of an administrative system that concentrates the power to make laws and the power to enforce them in the hands of a vast and unaccountable administrative apparatus that finds no comfortable home in our constitutional structure. The end result may be trains that run on time (although I doubt it), but the cost is to our Constitution and the individual liberty it protects.

Association of Am. R.Rs., 135 S. Ct. at 1254-55 (Thomas, J., concurring). In facilitating the vast expansion of the administrative state, the legislative and executive branches transferred power from the people's elected representatives and elected executives, bestowing it upon unelected and

9

unaccountable bureaucrats, thereby jeopardizing the constitution's safeguards against the tyrannical concentration of power. "The administrative regime consolidates in one branch of government the powers that the Constitution allocates to different branches" resulting in "the exercise of power outside and above the law." Hamburger, supra ¶4, at 6.

> To the Framers of the United States Constitution, the concentration of governmental power presented an extraordinary threat to individual liberty: "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961).

Gabler, 376 Wis. 2d 147, ¶4 (ellipsis by Gabler).

¶54 In Tetra Tech EC, Inc. v. Wisconsin Department of Revenue, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21, we "end[ed] our practice of deferring to administrative agencies' conclusions of law," thereby reclaiming the judiciary's constitutionally-vested authority to say what the law is. Id., ¶3 (Kelly, J., lead opinion).[4]  Rather than placidly accepting the administrative state as a necessary appendage to the government, this court should reconsider its acquiescence to

---

[4] The legislature codified this principle in Wis. Stat. § 227.57 (11) ("Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law.").

10

subdelegations[5] of legislative power to administrative agencies within the executive branch when the appropriate case presents the opportunity. It "is the obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well." City of Arlington v. F.C.C., 569 U.S. 290, 327 (2013) (Roberts, C.J., dissenting). In this case, however, none of the parties raise the issue of whether "our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers." Whitman, 531 U.S. at 487 (Thomas, J., concurring).

¶55 Passing legislation sometimes requires political courage. Legislative initiatives may move slowly and some bills never become laws. Consequently, "Congress often prefers to set a politically uncontroversial goal and leave it to the agencies to figure out the politically controversial means of achieving that goal." Charles J. Cooper, Confronting the Administrative State, 25 National Affairs 96, 103 (Fall 2015). Returning all lawmaking responsibilities to the legislature would remove the shroud over administrative rulemaking, placing the lawmaking process back in the public eye where it constitutionally belongs.

---

[5] Because the people delegate power through constitutional grants, "when Congress purports to give its legislative power to the executive, the question is not whether the principal can delegate the power, but whether the agent can subdelegate it." Hamburger, supra ¶5 note 2, at 377. "[T]he agent ordinarily cannot subdelegate the power to a sub-agent, as this runs counter to the apparent intent of the principal." Id. at 380.

11

¶56 The objective of our Founders was not an "efficiently functioning government."[6] The Founders designed a Constitution to safeguard individual rights and liberty. The Wilsonian vision of rule by enlightened bureaucrats diminishes the power of the people, in derogation of the principles on which America was founded. "The vesting of legislative power in a distinct political body is a stumbling block to modern intellectuals and a stone rejected by the builders of the federal bureaucracy, but it has been and remains a cornerstone in the constitutional architecture of free government." Texas v. United States, 300 F. Supp. 3d 810, 841 (N.D. Tex. 2018). "Admittedly, the legislative process can be an arduous one. But that's no bug in the constitutional design: it is the very point of the design." Gutierrez-Brizuela, 834 F.3d at 1151 (Gorsuch, J., concurring).

> By separating the lawmaking and law enforcement functions, the framers sought to thwart the ability of an individual or group to exercise arbitrary or absolute power. And by restricting lawmaking to one branch and forcing any legislation to endure bicameralism and presentment, the framers sought to make the task of lawmaking more arduous still.

United States v. Nichols, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting). The "inefficiency" inherent in the legislative process "'serves a valuable' liberty-preserving 'function.'" Id. (quoted source omitted). "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty."

---

[6] Majority op., ¶17.

12

Morrison v. Olson, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting).

¶57 "The Framers could hardly have envisioned . . . the authority administrative agencies now hold over our economic, social, and political activities." City of Arlington, 569 U.S. at 313 (Roberts, C.J., dissenting). Rather than extolling the necessity of the administrative behemoth in Wisconsin, this court should "glance at the Constitution to see what it says about how [governmental] authority must be exercised and by whom." See Association of Am. R.Rs., 135 S. Ct. at 1240 (Thomas, J., concurring). Through the Wisconsin Constitution, the people conferred exclusive powers on an elected executive, an elected legislature, and an elected judiciary, respectively. Noticeably absent from the Wisconsin Constitution is any apportionment of power to unelected and unaccountable administrators. Because the majority lends unquestioned credence to the extra-constitutional apparatus of the administrative state, I respectfully concur.

13

¶58 DANIEL KELLY, J. *(concurring).* I join the majority opinion except with respect to ¶17.

¶59 ANN WALSH BRADLEY, J. *(dissenting).* A mere three years ago, this court decided the very issue that it is reconsidering today. In Coyne v. Walker, a majority of the court determined that 2011 Act 21 (Act 21) is "unconstitutional and therefore void as applied to the Superintendent of Public Instruction and his subordinates." 2016 WI 38, ¶4, 368 Wis. 2d 444, 879 N.W.2d 520.

¶60 Yet despite this clear mandate, here we are again. A provision that does the very same thing as Act 21 is back before the court. It comes to us through a new enactment (2017 Wis. Act 57) and with a catchy new name (the REINS Act), but the substance is identical.[1]

¶61 And why are we here again? At oral argument, counsel for the petitioners was asked, "you wouldn't be here asking a supreme court of the state of Wisconsin to overturn a decision that it just made two years ago if it were the same court, would you?" In response, counsel acknowledged, "any lawyer has to make strategic decisions about what is likely to be successful." Indeed.

¶62 Although nothing in our Constitution has changed since Coyne was decided, what has changed is the membership of the court. This time around, a new majority of this court does an about-face and now concludes that the substance of Act 57 is

---

[1] See majority op., ¶7 ("The REINS Act did not alter Act 21's requirement that an agency (1) submit a statement of scope to the governor for approval prior to drafting a proposed rule, and (2) submit a final draft of a rule to the governor for approval before submitting it to the legislature.").

1

constitutional. To reach this conclusion, it throws the doctrine of stare decisis out the window.[2]

¶63 Not only is the majority opinion doctrinally erroneous, it is also analytically unpersuasive. As Justice Abrahamson wrote in Coyne: "rulemaking is part of the 'supervision of public instruction,' which Article X, Section 1 vests in the superintendent."[3] 368 Wis. 2d 444, ¶85 (Abrahamson, J., concurring). Act 21 is unconstitutional "because it grants the governor (and the Secretary of the Department of Administration) an unchecked veto power over the superintendent's rulemaking powers, thereby making the superintendent subordinate to the governor (and the Secretary)

---

[2] "Stare decisis" is fundamental to the rule of law. Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. It refers to the principle that requires courts to "stand by things decided." State v. Harrell, 199 Wis. 2d 654, 667, 546 N.W.2d 115 (1996) (Abrahamson, J., concurring); see Black's Law Dictionary 1626 (10th ed. 2014) defining "stare decisis" as "[t]he doctrine of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation").

[3] Article X, Section 1 of the Wisconsin Constitution provides:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

2

in the supervision of public instruction." Id. Act 57 suffers the same infirmity.

¶64 Because the majority disregards binding precedent and arrives at a result that unconstitutionally transfers the vested authority of the Superintendent of Public Instruction to the governor, I respectfully dissent.

I

¶65 This case arises from a petition for original action filed by the Petitioners against the Superintendent of Public Instruction (SPI) and the Department of Public Instruction (DPI). Majority op., ¶1. The Petitioners seek a declaration that the SPI and DPI must comply with 2017 Wis. Act 57's (Act 57) requirement that they receive the governor's approval prior to drafting or promulgating an administrative rule. Id. In response, the SPI and DPI argue, consistent with Coyne, 368 Wis. 2d 444, that such a requirement is an unconstitutional usurpation of the SPI's vested constitutional authority. Id.

¶66 Relegating the discussion of stare decisis to a footnote, the majority states that it "consider[ed] whether the doctrine of stare decisis should be employed in the case before us." Id., ¶8 n.5 (citation omitted). It acknowledges that Coyne "addressed some of the same statutory provisions and constitutional concerns we examine today . . . ." Id.

¶67 However, it declines to apply the doctrine of stare decisis, reasoning that "stare decisis does not require us to retain constitutional interpretations that were objectively wrong when made . . . because such interpretations are unsound

3

in principle." <u>Id.</u> (citations omitted). Further, it asserts that it is not required to follow <u>Coyne</u> because "our mandate in <u>Coyne</u> arises from a lead opinion, joined by one justice, a two-justice concurrence, and a one-justice concurrence." <u>Id.</u> Unsurprisingly, the majority ultimately grants the petitioners' requested relief. <u>Id.</u>, ¶2.

II

¶68 Neither of the majority's proffered rationales for departing from stare decisis is persuasive. Stare decisis is fundamental to the rule of law. <u>Johnson Controls, Inc. v. Emp'rs Ins. of Wausau</u>, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. Indeed, "[t]his court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." <u>Id.</u>

¶69 "Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." <u>Schultz v. Natwick</u>, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (internal quotation and citations omitted).

¶70 "No change in the law is justified by a change in the membership of the court . . . ." <u>Bartholomew v. Wis. Patients Comp. Fund</u>, 2006 WI 91, ¶32, 293 Wis. 2d 38, 717 N.W.2d 216 (citation omitted). Adherence to precedent fosters confidence in the reliability of court decisions, promotes consistent development of legal principles, and contributes to the actual

and perceived integrity of the Wisconsin judiciary. <u>See</u> <u>Johnson Controls</u>, 264 Wis. 2d 60, ¶95.

¶71 Throwing caution to the wind, the majority disregards the principles that fundamentally underlie our legal system. It contends that <u>Coyne</u> was "objectively wrong." Majority op., ¶8 n.6. Further, it ascribes significance to the fact that the majority in <u>Coyne</u> consisted of three separate opinions. <u>Id.</u>

¶72 Apparently, "objectively wrong" is defined by the majority as what it subjectively thinks is wrong. The majority provides no explanation for the assertion that <u>Coyne</u> was "objectively wrong" other than that it disagrees with it.

¶73 Additionally, the split nature of the <u>Coyne</u> opinion is of no import. The mandate of <u>Coyne</u> was clear despite the fractured nature of the opinions. Although the four justices in the majority subscribed to differing rationales, they agreed on the essential conclusion: "We hold that Act 21 is unconstitutional and therefore void as applied to the

5

Superintendent of Public Instruction and his subordinates." Coyne, 368 Wis. 2d 444, ¶4.[4] Full stop.

¶74 Such a decision creates no uncertainty and fosters no confusion. Act 57, at issue here, does not differ in any material respect from Act 21.

¶75 Accordingly, I conclude that the doctrine of stare decisis applies here with full force. The rule of law and the "actual and perceived integrity of the judicial process" demand it. See Johnson Controls, 264 Wis. 2d 60, ¶95.

III

¶76 The majority errs further in its substantive analysis of the separation of powers issues this case presents. I joined Justice Abrahamson's concurrence in Coyne, and I believe that it remains the correct analysis here.

¶77 In Coyne, Justice Abrahamson's concurrence determined that 2011 Wis. Act 21, which is in all material respects identical to Act 57, "unconstitutionally infringes on the 'supervision of public instruction' vested in the superintendent

---

[4] See also Coyne v. Walker, 2016 WI 38, ¶80, 368 Wis. 2d 444, 879 N.W.2d 520 (Abrahamson, J., concurring) ("I conclude, as do the lead opinion (which represents the views of only Justice Gableman) and Justice Prosser's concurrence, that 2011 Wis. Act 21, which altered the process of administrative rulemaking, is unconstitutional as applied to the Superintendent of Public Instruction and the Department of Public Instruction."); id., ¶155 (Prosser, J., concurring) (concluding that Act 21 is unconstitutional "because it would give a governor authority to obstruct the work of an independent constitutional officer to such an extent that the officer would be unable to discharge the responsibilities that the legislature has given him. An absolute veto power over a proposed rule is a check without a balance.").

by Article X, Section 1 of the Wisconsin Constitution." Coyne, 368 Wis. 2d 444, ¶93 (Abrahamson, J., concurring). It reached this conclusion because Act 21 "gives 'equal or superior authority' [over the supervision of public instruction] to . . . '[an]other officer.'" Id., ¶100 (Abrahamson, J., concurring) (citing Thompson v. Craney, 199 Wis. 2d 674, 699, 546 N.W.2d 123 (1996)).[5] The same is true of Act 57.

¶78 Such a conclusion is supported by significant constitutional history as has been previously set forth by this court in Thompson and Coyne. See Coyne, 368 Wis. 2d 444, ¶98 (Abrahamson, J., concurring); Thompson, 199 Wis. 2d at 685-98. "The debates at the 1846 and 1847–48 Wisconsin constitutional conventions show that the drafters of the Wisconsin Constitution intended the public schools to be under the supervision of the SPI, and that the SPI was to be an elected, not appointed, public official." Thompson, 199 Wis. 2d at 685.

¶79 Delegates to the constitutional conventions echoed two consistent themes: "first, that the system of education required uniformity[, and] second, that the SPI was to provide this uniformity in an active manner by implementing the system of education." Id. at 688-89. Accordingly, the framers "considered and explicitly rejected a proposal to select a superintendent by gubernatorial appointment and a proposal that

---

[5] This court previously determined in Thompson that the former powers of the elected SPI cannot constitutionally be given to appointed "other officers" at the state level who are not subordinate to the SPI. Thompson v. Craney, 199 Wis. 2d 674, 678, 546 N.W.2d 123 (1996).

would have allowed the legislature to vest 'the supervision of public instruction . . . in such officers as shall hereafter be created by law.'" Coyne, 368 Wis. 2d 444, ¶98 (Abrahamson, J., concurring) (citing Thompson, 199 Wis. 2d at 685-86). "Simply put, the framers viewed the superintendent as 'indispensable,' 'the foundation, the life of progressive education' who 'alone c[ould] give uniformity, energy, and efficiency to the system.'" Id. (citing Journal of the Convention, reprinted in The Convention of 1846, at 568, 570-71 (Milo M. Quaife ed. 1919).

¶80 Consistent with this history and the determination of the Thompson court, the concurrence concluded that "rulemaking is a supervisory power of the superintendent and that 2011 Wis. Act 21 unconstitutionally gives the governor and the secretary of the Department of Administration the unchecked authority to block rulemaking by the superintendent." Coyne, 368 Wis. 2d 444, ¶99 (Abrahamson, J., concurring). Act 57 does exactly the same thing. Thus, the analysis presented in Justice Abrahamson's concurrence in Coyne is equally applicable to the issue in this case. Just as Act 21 was unconstitutional three years ago, Act 57 remains unconstitutional today.

¶81 For the foregoing reasons, I respectfully dissent.

¶82 I am authorized to state that Justice REBECCA FRANK DALLET joins this dissent.

8